UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



CVR ENERGY, INC.,

                          Plaintiff,

   -v-

WACHTELL, LIPTON, ROSEN & KATZ, *et al.*

                        Defendants.

No. 14-cv-6566 (RJS)
<u>ORDER</u>

<u>RICHARD J. SULLIVAN</u>, District Judge:

Plaintiff CVR Energy, Inc. ("CVR" or "Plaintiff") brings this action against its former law firm Wachtell, Lipton, Rosen & Katz ("Wachtell") and two of the firm's partners, Benjamin M. Roth and Andrew R. Brownstein (together with Wachtell, "Defendants"), alleging that Defendants committed malpractice during their representation of CVR during a 2012 takeover bid.  Now before the Court is Defendants' motion for judgment on the pleadings.  (Doc. No. 128.)  For the reasons stated below, Defendants' motion is GRANTED and Plaintiff's request for leave to amend is GRANTED IN PART and DENIED IN PART.

I. BACKGROUND[1]

A. Facts

Plaintiff is "a public company engaged in the oil refining and fertilizer business."  (AC ¶ 12.)  In January 2012, the prominent investor Carl C. Icahn announced that, through entities

---

[1] "On a [Federal Rule of Civil Procedure] 12(c) motion, the court considers 'the complaint, the answer, any written documents attached to them, and any matter of which the court can take judicial notice for the factual background of the case." *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011) (quoting *Roberts v. Babkiewicz*, 582 F.3d 418, 419 (2d Cir. 2009)).  Accordingly, the following facts are drawn from Plaintiff's Amended Complaint, filed on February 20, 2015 (Doc. No. 75 (the "Amended Complaint" or "AC")) and Defendants' answer thereto (Doc. No. 112).  The Court has also considered Defendants' supporting memorandum of law (Doc. No. 129 ("Mem.")), and the

under his control, he "had acquired a substantial minority stake in [P]laintiff." (*Id.*) On January 16, 2012, CVR's General Counsel Edmund Gross engaged Defendants "to advise CVR on all matters of 'shareholder activism,' including any matters relating to" Icahn. (*Id.* ¶ 14.) CVR also retained two banks – Goldman Sachs & Co. and Deutsche Bank – to advise it on any "attempts to acquire the stock or assets of CVR or to otherwise obtain control of CVR." (*Id.* ¶ 13.) In contracts it now refers to as the "First Engagement Letters," CVR agreed to pay the two banks $2 million and $1 million, respectively, for their guidance. (*Id.* ¶¶ 16–17.)

On February 16, 2012, Icahn announced a tender offer for Plaintiff's shares. (*Id.* ¶ 18.) Following Icahn's announcement, Goldman Sachs and Deustche Bank renegotiated their contracts with Plaintiff's Chief Financial Officer, Frank Pici. (*See id.* ¶ 23.) Under the new agreements – the "Second Engagement Letters" – each bank was to receive "an 'Independence Fee' of $9 million if CVR remained independent . . . and an Enterprise Value fee . . . if CVR was sold, denominated a 'Sale Transaction.'" (*Id.* ¶¶ 23–24.) The Enterprise Value fee was "expressed as a percentage of the [sale] value of CVR" (*id.* ¶ 24) – in this case, 0.525% (Doc. No. 130-5 at 3; Doc. No. 130-6 at 2).

Plaintiff's efforts to resist Icahn's takeover bid were unsuccessful, and on April 18, 2012, CVR's board approved a sale to the Icahn entities at the original price of $30 per share (AC ¶¶ 34, 37), valuing the company at about $2.6 billion, *see* Form 8-K, CVR Energy, Inc. (May 25, 2012), *available at* https://www.sec.gov/Archives/edgar/data/1376139/000119312512248094/d358557d 8k.htm. In early May 2012, Goldman Sachs and Deutsche Bank "submitted their invoices to CVR for a total of more than $36 million" – representing the Enterprise Value fees. (AC ¶ 41.) CVR's board "did not approve the invoices for payment," and the banks filed suit in the New York

---

exhibits attached thereto (Doc. No. 130); Plaintiff's opposition (Doc. No. 135 ("Opp'n")) and the exhibit attached thereto; and Defendants' reply memorandum (Doc. No. 144 ("Reply")).

Supreme Court "to enforce the [S]econd [E]ngagement [L]etters." *Goldman, Sachs & Co. v. CVR Energy, Inc.*, No. 652149/2018, 2014 N.Y. Misc. LEXIS 4045, at *7 (Sup. Ct. N.Y. Cty. Sept. 8, 2014). On September 8, 2014, the Supreme Court entered summary judgment in the banks' favor, awarding each bank over $18 million. *Id.* at *16.

In 2014, well after Icahn's takeover of CVR, the Securities and Exchange Commission (the "SEC") "initiated an investigation of CVR concerning whether" two Schedule 14D-9 forms submitted around the time of Icahn's takeover bid were proper. (AC ¶ 43.) The forms, filed on March 1, 2012 and April 23, 2012, "characterized the fee terms" that CVR had "entered into with Goldman Sachs and Deutsche Bank as 'customary.'" (*Id.* ¶¶ 30, 38). In filing both forms, "CVR relied completely on [Defendants'] advice." (*Id.* ¶ 39.) After a multi-year investigation, Plaintiff settled the investigation with the SEC. (Doc. No. 135-1 at 1.) In its order terminating its investigation, the SEC found that the fees paid to Goldman Sachs and Deutsche Bank "were not customary, and [that] the material terms of the compensation arrangement . . . should have been disclosed." (*Id.* at 2 ¶ 2.) The SEC therefore concluded that Plaintiff had "violated Exchange Act Section 14(d)(4) and Rule 14d-9 thereunder" (*id.* at 6 ¶ 25), but did not impose a monetary penalty or fine. (*Id.* at 6–7.)

## B.  Procedural History

On October 24, 2013, CVR filed this lawsuit for legal malpractice in the United States District Court for the District of Kansas, alleging that "neither Goldman, Deutsche, nor [D]efendants explained to" CVR "that if the result of the Icahn Tender Offer was the acquisition of more than fifty percent of CVR's stock by [Icahn] with no increase in the $30 per share consideration," then the banks would "consider . . . this event a 'Sale Transaction,' triggering the Enterprise Value fee, a fee that would amount to more than $18 million" for each bank. (Doc. No. 1 ¶ 25.) On December 18, 2013, Defendants moved to dismiss the complaint for lack of personal

jurisdiction and improper venue.  (Doc. No. 9.)  On that same day, Wachtell sued Plaintiff in New York Supreme Court, seeking (among other relief) a declaratory judgment that it had not committed malpractice.  (Doc. No. 57-1.)  Plaintiff counterclaimed for legal malpractice.  (Doc. No. 84-1.)  On August 18, 2014, the District Court for the District of Kansas transferred the action to this Court (Doc. No. 34), and Plaintiff amended its complaint in this Court on February 20, 2015 (Doc. No. 75).

While this suit was pending in this Court, the parties' litigation in New York Supreme Court continued apace.  On February 25, 2015, that court granted Wachtell's motion to dismiss Plaintiff's legal malpractice counterclaim, *Wachtell, Lipton, Rosen & Katz v. CVR Energy, Inc.* (*Wachtell*), No. 654343/2013, 2015 WL 782636 (N.Y. Sup. Ct. Feb. 24, 2015), after which Defendants moved to dismiss this action on *res judicata* grounds (Doc. No. 82).  On March 29, 2016, this Court granted Defendants' motion (Doc. No. 96), and Plaintiff appealed the Court's ruling to the Second Circuit shortly thereafter (Doc. No. 99).  However, following a decision from the Appellate Division of the New York Supreme Court reversing the dismissal of Plaintiff's state court counterclaim, *Wachtell, Lipton, Rosen & Katz v. CVR Energy, Inc.*, 39 N.Y.S.3d 772 (1st Dep't 2016), and the subsequent withdrawal of CVR's appeal of this Court's dismissal order to the Second Circuit (*see* Doc. No. 103), the Court reinstated this suit on July 11, 2017 (Doc. No. 105).  Plaintiff then stipulated to the dismissal of its malpractice counterclaim in state court on October 4, 2017.  *See Wachtell*, N.Y. Sup. Ct. No. 654343/2013, Doc. No. 115.

Defendants filed the instant motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c) on January 22, 2018.  (Doc. No. 128.)  Defendants argue that Plaintiff's complaint fails to state a claim for legal malpractice because – in Defendants' telling – none of Plaintiff's theories of how that malpractice occurred, if proven, could possibly establish that

4

Defendants' conduct fell below the applicable standard of professional care.   (Mem. at 11.) Plaintiff opposed the motion on February 12, 2018 (Doc. No. 135), and the motion was fully briefed on February 26, 2018 (Doc. No. 144).

## II. LEGAL STANDARD

In deciding a Rule 12(c) motion for judgment on the pleadings, a court "employ[s] the same standard applicable to dismissals pursuant to" Federal Rule of Civil Procedure 12(b)(6). *Hayden v. Paterson*, 594 F.3d 150, 160 (2d Cir. 2010).   Thus, the court must "accept all factual allegations in the complaint as true, draw all reasonable inferences in [Plaintiff's] favor," and deny the Rule 12(c) motion if the plaintiff's complaint "contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.*; *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).   "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).   By contrast, a pleading that only "offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555).   If a plaintiff "ha[s] not nudged [his] claims across the line from conceivable to plausible, [his] complaint must be dismissed." *Twombly*, 550 U.S. at 570.

## III. DISCUSSION

### A.  Timeliness of Defendants' Motion

As an initial matter – and in an obvious attempt to short-circuit the Court's review of its Amended Complaint – Plaintiff asserts that Defendants' motion "should be summarily denied as untimely." (Opp'n at 13.)   However, Federal Rule of Civil Procedure 12(c) provides that judgment on the pleadings is proper "[a]fter the pleadings are closed," so long as the motion is made "early enough not to delay trial."   Due in substantial part to Plaintiff's dilatory document production (*see*

Doc. No. 140), discovery in this case has been delayed such that expert discovery will not close until November 28, 2018, and no trial date has been set. (*See* Doc. No. 154 ¶ 9.) Accordingly, Defendants' motion is clearly timely, since the Court's consideration of the motion "will have no perceptible impact on any yet-to-be scheduled trial." *Vail v. City of New York*, 68 F. Supp. 3d 412, 422–23 (S.D.N.Y. 2014) (considering a Rule 12(c) motion made while "[d]iscovery was still ongoing, . . . expert discovery had not yet occurred, and a trial date had not yet been set"). Therefore, the Court will proceed to the merits of Defendants' motion.

## B.  Plaintiff's Legal Malpractice Claim

"In a diversity action based on attorney malpractice, state substantive law, here that of New York, applies." *Rubens v. Mason*, 527 F.3d 252, 254 (2d Cir. 2008). "To prevail on such a claim, [Plaintiff] must demonstrate 'that the attorney was negligent, that the negligence was a proximate cause of the injury and that [Plaintiff] suffered actual and ascertainable damages.'" *Id.* at 254–55 (quoting *Rubens v. Mason*, 387 F.3d 183, 189 (2d Cir. 2004)). "The negligence prong requires the plaintiff to allege that the attorney's conduct 'fell below the ordinary and reasonable skill and knowledge commonly possessed by a member of his profession.'" *Barack v. Seward & Kissel, LLP*, No. 16-cv-9644 (WHP), 2017 WL 4023141, at *3 (S.D.N.Y. Sept. 12, 2017) (quoting *Achtman v. Kirby, McInerney & Squire, LLP*, 464 F.3d 328, 337 (2d Cir. 2006)).

Although Plaintiff's complaint contains a single cause of action for professional malpractice, Plaintiff identifies several instances of negligent conduct that it alleges fell below applicable professional standards.  Specifically, Plaintiff contends that Defendants (1) failed to properly negotiate fee terms with the banks, (2) failed to properly explain those terms to CVR, (3) improperly caused CVR to ratify the Second Engagement Letters, (4) incorrectly prepared two submissions to the SEC, and (5) created false minutes of the February 28, 2012 meeting of CVR's

6

board. (AC ¶ 49; *see also* Opp'n at 13–22.) The Court will address each of Plaintiff's theories in turn.

1. Failure to Negotiate Preferred Fee Terms

Plaintiff's first theory – that Defendants committed malpractice when they failed to "negotiat[e] fair and appropriate fee terms with Goldman and Deutsche" (AC ¶ 49(a)) – is insufficient as a matter of law. An attorney may be liable for malpractice where he negotiates a contract that does not "accurately reflec[t] [the client's] understanding of the transaction," *Maurice W. Pomfrey & Assocs., Ltd. v. Hancock & Estabrook, LLP*, 862 N.Y.S.2d 217, 219 (4th Dep't 2008), or makes an error in that process which operates to his client's detriment, *see Malik v. Beal*, 864 N.Y.S.2d 153, 155 (2d Dep't 2008). But an attorney cannot be liable for malpractice where the client "negotiated and controlled the terms" of an agreement it "now find[s] unfavorable." *Sutherland v. Milstein*, 698 N.Y.S.2d 15, 16 (1st Dep't 1999). Here, Plaintiff admits that Frank Pici, CVR's CFO, "negotiate[d] the business terms of the banks' fees." (Opp'n at 18; *see also id.* at 19 (making the same claim).) This admission is supported by the Amended Complaint itself, which sets out that Pici negotiated the fees in the first set of engagement letters between CVR and the banks (AC ¶ 16), served as the banks' point of initial contact in negotiating the Second Engagement Letters (*id.* ¶ 23), received a memorandum summarizing the fee terms of the Second Engagement Letters (*id.* ¶ 24), and signed the Second Engagement Letters on behalf of CVR (*id.* ¶ 32). The Amended Complaint further alleges that Defendants (along with CVR's General Counsel Edmund Gross) received drafts of the Second Engagement Letters from the banks during the revision process (*id.* ¶ 31), but, significantly, the Amended Complaint does not assert that Defendants had the authority to modify the fee terms in the Second Engagement Letters or that they were asked to do so. Accordingly, Plaintiff has failed to properly allege that Defendants

committed malpractice by failing to "negotiat[e] fair and appropriate fees with Goldman and Deutsche." (AC ¶ 49(a).)

Perhaps recognizing the weakness of its malpractice argument, Plaintiff reframes its theory in its Opposition to arise out of Defendants' supposed failure "to ensure that the formal engagement letters reflected the essence of what [Pici] negotiated: a success fee . . . that would be payable only if CVR were sold to a third-party, not if Carl Icahn succeeded in his hostile tender offer." (Opp'n at 18–19; *see also id.* at 19 ("Again, the point is that, although Mr. Pici did negotiate the business terms, it was Wachtell's obligation to at least make sure that the written engagement comported with the terms Mr. Pici believed had been agreed to.").) This framing, however, fares no better in saving Plaintiff's claim, for the simple reason that Plaintiff nowhere alleges that Pici ever reached such an agreement with the banks or that he communicated his understanding of the agreement to Defendants. Absent allegations that Pici told Defendants what he had negotiated (or thought he had negotiated) – *i.e.*, that an Enterprise Value fee was only to be paid if CVR were sold to someone *other than* Icahn – and then directed Defendants to formalize those terms into a writing, Defendants cannot possibly have been negligent in failing to conform the Second Engagement Letters to Pici's subjective understanding.[2]

### 2. Failure to Appropriately Explain the Second Engagement Letters

Plaintiff next contends that Defendants' conduct fell below the applicable standard of care because Defendants failed to appropriately explain the terms of the Second Engagement Letters.

---

[2] Moreover, judgment on the pleadings is also appropriate because the Amended Complaint does not properly allege any injury attributable to this alleged misconduct. Although Plaintiff speculates in its Opposition that "there is very good reason to infer that the banks would have agreed to non-perverse fee terms had [Defendants] bothered to try to convince the banks to do so" (Opp'n at 20), the Amended Complaint does not actually set out any basis upon which the Court can conclude that either Goldman Sachs or Deutsche Bank would have agreed to such a carve-out had they been asked. Because an attorney can only be liable for malpractice where his or her conduct is the proximate cause of a client's losses, *Bryant v. Silverman*, 284 F. Supp. 3d 458, 470–71 (S.D.N.Y. 2018), Plaintiff has not properly alleged that Defendants' failure to negotiate on its behalf caused it to sign the deal on terms that it now dislikes, *see Stokes v. Lusker*, No. 08 Civ. 3667 (CM), 2009 WL 612336, at *11 (S.D.N.Y. Mar. 4, 2009).

(*See, e.g.*, AC ¶¶ 29, 31.)  Specifically, Plaintiff asserts that Defendants inaccurately explained the fee terms during a February 28, 2012 board meeting (AC ¶ 29 n.2; *see also* Opp'n at 15) and that, in March 2012, Defendants incorrectly advised Plaintiff that the letters were "OK" to sign (AC ¶ 32; *see also* Opp'n at 16).

Plaintiff's main argument – that Defendants committed malpractice when they did not explain the contents of the Second Engagement Letters to CVR during a February 28, 2012 board meeting (or otherwise) (AC ¶¶ 29 ("[N]either Roth nor Brownstein, nor anyone else at Wachtell ever explained the new proposed fees to the Board of CVR."), 31) – cannot stand.  Although an attorney's "*incorrect* explanation of the contents of legal documents" may provide a sufficient basis for "a legal malpractice claim," *Kram Knarf, LLC v. Djonovic*, 903 N.Y.S.2d 386, 386 (1st Dep't 2010) (emphasis added), Plaintiff cites no authority for the proposition that a malpractice claim may lie where the plaintiff's sole allegation is that his attorney did not explain an otherwise-unambiguous legal document.  Indeed, New York law is clear that there can be "no malpractice liability" for "failure to advise a plaintiff-client of the consequences of a contractual provision" where "the agreement reveal[s] on its face what the client claim[s] he was not told." *Preferred Fragrance, Inc. v. Buchanan Ingersoll & Rooney PC*, No. 15-cv-1293 (BMC), 2015 WL 6143612, at *6 (E.D.N.Y. Oct. 18, 2015) (quoting *Diamond v. Sokol*, 468 F. Supp. 2d 626, 635 (S.D.N.Y. 2006)); *see also Beattie v. Brown & Wood*, 663 N.Y.S.2d 199, 199 (1st Dep't 1997) (dismissing plaintiff's "allegation that he was not advised by defendant law firm" of certain consequences of a settlement agreement where the allegation was "flatly contradicted" by the agreement itself).  That is, if a risk is "plainly stated," an attorney cannot be liable for failing to explain it. *See, e.g.*, *Preferred Fragrance*, 2015 WL 6143612, at *6–7 ("[I]t is one thing for a client to rely on his lawyer's incorrect advice that a contractual provision does not mean what it says; it is quite another

9

to hold that a lawyer will be liable in malpractice for not explaining to a client what a plainly worded contractual provision does, in fact, say.").

Here, the Second Engagement Letters were disclosed to Gross, CVR's General Counsel (*see* AC ¶ 31), and Pici, CVR's CFO (*see id.* ¶ 32), and the terms of the Second Engagement Letters are plain on their face – the banks were to be paid the Enterprise Value fee upon a sale of the company, whether to Icahn or another bidder.[3] *See Orlander v. Staples, Inc.*, 802 F.3d 289, 294 (2d Cir. 2015) ("Whether or not a writing is ambiguous is a question of law to be resolved by the courts." (quoting *W.W.W. Assocs., Inc. v. Giancontieri*, 77 N.Y.2d 157, 162 (1990))).  Indeed, CVR's agreement with Deutsche Bank specifically defines the term "Sale Transaction" – the trigger to the Enterprise Value fee – to include "any Icahn Proposal." (Doc. No. 130-5 at 1.)  And the contract between CVR and Goldman Sachs provides that the Enterprise Value fee is due on a sale to "any person or group." (Doc. No. 130-6 at 2.)  Carl Icahn clearly qualifies as "any person," and entities under his control clearly fall under the category of "any group."

Moreover, CVR is estopped from arguing that the Second Engagement Letters are ambiguous.  In the lawsuit brought by Goldman Sachs and Deutsche Bank to recover the Enterprise Value fees, the New York Supreme Court, Commercial Division held that "[c]ontrary to CVR's contention, the fee provisions of the second engagement letters are not ambiguous, nor can they be interpreted as excluding a transaction with Icahn." *Goldman, Sachs & Co. v. CVR Energy, Inc.*, No. 652149/2012, 2014 N.Y. Misc. LEXIS 4045, at *13 (Sup. Ct. N.Y. Cty. Sep. 8, 2014).

---

[3] Plaintiff also alleges that Defendants committed malpractice by failing to "advis[e] the CVR Board about the existence or terms of the Second Engagement Letters" and "never communicat[ing] any of their terms to" Plaintiff's CEO, Jack Lipinski, to whom the Second Engagement Letters were addressed.  (AC ¶¶ 49(b)–(c).)  Plaintiff's Amended Complaint, however, establishes that senior CVR management – the company's CFO Pici and General Counsel Gross – were aware of the letters (*id.* ¶¶ 31–32), and provides no basis upon which the Court could conclude that Defendants fell below the applicable standard of care in working with those managers rather than advising the full board at every step of the way. *See Joseph DelGreco & Co., Inc. v. DLA Piper L.L.P. (U.S.)*, 899 F. Supp. 2d 268, 277 (S.D.N.Y. 2012).

Because Plaintiff had the opportunity to litigate whether or not the Second Engagement Letters were clear, and because the ambiguity of those documents was a dispositive issue at summary judgment, the Supreme Court's holding is preclusive. *See Jenkins v. City of New York*, 478 F.3d 76, 85 (2d Cir. 2007) ("In New York, collateral estoppel has two essential elements. 'First, the identical issue necessarily must have been decided in the prior action and be decisive of the present action, and second, the party to be precluded . . . must have had a full and fair opportunity to contest the prior determination.'" (quoting *Juan C. v. Cortines*, 89 N.Y.2d 659, 667 (1997))). CVR's contention that Defendants committed malpractice by failing to explain the fee terms in the Second Engagement Letters therefore must be rejected.

Having failed in its principal malpractice argument, Plaintiff raises two alternative theories of to how Defendants supposedly incorrectly communicated the terms of the Second Engagement Letters. First – notwithstanding Plaintiff's clear assertion thatf Roth "never made" the statements attributed to him in the minutes of the February 28, 2012 board meeting (AC ¶ 29) – Plaintiff nonetheless argues in its Opposition that footnote 2 to paragraph 29 "alleges, alternatively, that . . . the supposed statements by Mr. Roth [to the board] were 'misleading, inaccurate, and incomplete.'" (Opp'n at 5 (quoting AC ¶ 29 n.2).) Thus, while insisting that Defendant Roth "never made the presentation attributed to him in [the board meeting minutes]" (AC ¶ 29 n.2), Plaintiff also insists that the statements, had they been made, would have been misleading. Putting to one side whether it is even permissible to engage in such counterfactual pleading, *see 2004 Stuart Moldaw Tr. v. XE L.I.F.E., LLC*, 642 F. Supp. 2d 226, 240 ("[A] pleader may assert contradictory statements of fact only when legitimately in doubt about the facts in question." (quoting *Am. Int'l Adjustment Co. v. Glavin*, 86 F.3d 1455, 1461 (7th Cir. 1996))), Plaintiff's alternative theory fails for the simple reason that Roth's statements to the board – *if* made – were

clearly not misleading and were, in fact, completely consistent with the terms of the Second Engagement Letters.  According to the minutes, Defendant Roth explained to the board that the banks would be paid the Enterprise Value fee only "if [CVR] were sold." (*Id.* ¶ 29.)  Plaintiff then asserts that "without further explanation," Roth's representation "could only be reasonably interpreted by the listener as a sale of CVR, not the completion of Mr. Icahn's $30 Tender Offer." (*Id.* ¶ 29 n.2.)  But Roth's statement is simply not susceptible to the interpretation Plaintiff urges.  Considered in context, no reasonable listener could have heard Roth's presentation and concluded that Icahn's tender offer somehow would not count as a sale.  Indeed, the minutes of the February 28, 2012 board meeting (as quoted by Plaintiff in the Amended Complaint) reflect that Defendant Roth set out two possible scenarios for the payment of fees.  (*Id.* ¶ 29.)  Roth explained that the Banks "would receive a fee based on a percentage of the Company's enterprise value if the company were sold[,] and a different, fixed fee if the company were to remain independent after the [Icahn] proxy contest and tender offer." (*Id.*)  Because CVR could not possibly have remained "independent" after a successful tender offer, it is plain from Roth's statement that Icahn's tender offer, if successful, would count as a sale under the Second Engagement Letters.  Far from mischaracterizing the terms of the Second Engagement Letters, the statements attributed to Roth in the minutes are completely consistent with them.  Accordingly, Plaintiff's alternative (and contradictory) theory that Defendants incorrectly summarized the Second Engagement Letters during the February 28, 2012 board meeting must be rejected.

Plaintiff next suggests that Defendants improperly advised Pici "that the letters were 'OK' to sign" (*id.* ¶ 32), "thus misleading Mr. Pici into thinking that the fee terms were consistent with what he had negotiated" (Opp'n at 6).  But this is really just a variation on Plaintiff's other rejected arguments.  As noted above, a lawyer will not be held liable for malpractice for not explaining "to

a client what a plainly worded contractual provision does, in fact, say." *Preferred Fragrance*, 2015 WL 6143612, at \*6.   Absent some allegation that Defendants knew that Pici had a misunderstanding of the Second Engagement Letters and that he therefore would be misled by their representation that "the letters were 'OK' to sign" (AC ¶ 32), Plaintiff cannot prevail on this theory of attorney malpractice.   But, as discussed above, Plaintiff nowhere alleges that Pici ever conveyed to Defendants his subjective understanding of the terms of the Second Engagement Letters.   Nor does Plaintiff allege that Defendants somehow *knew* that Pici had an understanding that was inconsistent with the final version of the Second Engagement Letters.   Of course, Defendants were not required to read Pici's mind at the risk of a malpractice claim.   Accordingly, based on the allegations in the Amended Complaint, Defendants' assertion that the letters were "OK" cannot possibly have constituted legal malpractice.

In short, despite its kitchen sink approach to malpractice theories, Plaintiff has failed to allege any viable malpractice claim in connection with Defendants' explanation of the banks' fees.

### 3. Ratification

Plaintiff next advances two theories of malpractice related to its ratification of the Second Engagement Letters.   First, Plaintiff contends that in April 2012 – before the takeover – Defendants "tortiously procured and caused CVR's purported ratification of the perverse fee terms by preparing board resolutions that did not mention the amount of fees supposedly owed the banks." (Opp'n at 21; *see also* AC ¶ 36.)   Second, Plaintiff asserts that in May 2012 – after the Icahn takeover – Defendants "disloyally failed to advise CVR on how to undo the purported ratification of those fees after learning that CVR's board was not actually aware of what Mr. Pici had apparently agreed to." (Opp'n at 21.)   Both theories fail.

As to Plaintiff's first theory – Defendants' supposedly-tortious procurement of the board's ratification of the fee terms – the Amended Complaint alleges only that "defendants . . . prepared

for the Board's adoption . . . a boiler plate resolution that approved paying fees to Goldman and Deutsche . . . without bothering to explain to the CVR Board that the fees Goldman and Deutsche would charge were . . . the fees set forth in the Second Engagement Letters." (AC ¶ 36; *see also id.* ¶ 49(g) (making substantially the same allegation).) But this is simply a rehash of Plaintiff's previously-articulated theory that Defendants failed to explain the unambiguous terms of the Second Engagement Letters, which were themselves reviewed by CVR's General Counsel and signed by its CFO. Accordingly, it fails for the reasons set out in Section III.B.2 above.

Plaintiff's second theory – that Defendants committed professional malpractice by refusing to help the new CVR board undo the Second Engagement Letters – is equally untenable, as the Amended Complaint never alleges that Plaintiff asked for advice on how to "undo" the Second Engagement Letters. (Reply at 8.) Instead, it only states that after the takeover, Plaintiff's Chairman, Jack Lipinski, "asked for an explanation of what had occurred." (AC ¶ 42.) Then, Plaintiff, acting on its own, chose *not* to pay Goldman Sachs and Deutsche Bank. (AC ¶ 41.) *See also Goldman, Sachs*, 2014 N.Y. Misc. LEXIS 4045 at *6–7. Thus, Plaintiff's theory that Defendants committed malpractice by failing to help the new CVR board undo the prior board's ratification of the Second Engagement Letters must likewise be dismissed.

### 4. Preparation of SEC Forms

Plaintiff also argues that Defendants are liable for legal malpractice because of their "tortious preparation of certain [SEC] disclosures on Form 14D-9 that CVR filed in 2012." (Opp'n at 21.) Specifically, Plaintiff asserts that Defendants committed malpractice by characterizing the Second Engagement Letters' fees as "customary," a description that led to a costly SEC investigation. (*Id.* at 21–22; *see also* AC ¶¶ 38, 43–44.)

As noted above, "[t]o sustain a cause of action for legal malpractice, a party must show that an attorney failed to exercise 'the ordinary reasonable skill and knowledge' commonly

possessed by a member of the legal profession." *Darby & Darby, P.C. v. VSI Int'l, Inc.*, 95 N.Y.2d 308, 313 (N.Y. 2000) (quoting *Byrnes v. Palmer*, 45 N.Y.S. 479, 481 (2d Dep't 1897)). Thus, to make out a claim, "the plaintiff must first establish the standard of care the attorney owed the plaintiff." *Joseph DelGreco & Co., Inc. v. DLA Piper L.L.P. (U.S.)*, 899 F. Supp 2d 268, 277 (S.D.N.Y. 2012). Plaintiff makes no allegations to that effect in its Amended Complaint – it does not set out, for example, why Defendants should have known that the fee terms were not "customary" or what steps Defendants should have taken to ascertain whether their characterization of the fees as "customary" was accurate. *See Darby & Darby*, 95 N.Y.2d at 313 (noting that the focus of the malpractice inquiry is on the level of skill that the attorney should have exercised, as "measured at the time of the representation"). Instead, Plaintiff simply asserts that Defendants made an incorrect choice when they decided to describe the banks' fees as "customary." (*See* AC ¶ 38 ("[Defendants] advised CVR . . . to file a required form 14D-9 . . . which characterized the fee terms entered into with Goldman Sachs and Deutsche Bank as 'customary' when in fact Wachtell knew that . . . *there was at least a substantial question as to whether they were customary*." (emphasis added)).) Reduced to its essence, the Amended Complaint merely alleges that Defendants made an "error of judgment" in choosing to describe the fees as customary. *Achtman*, 464 F.3d at 337 ("A complaint that essentially alleges either an 'error of judgment' or a 'selection of one among several reasonable courses of action' fails to state a claim for malpractice." (quoting *Rosner v. Paley*, 65 N.Y.2d 736, 738 (1985))). As alleged in the Amended Complaint, this is not sufficient to state a claim for malpractice.

### 5. Creation of False Minutes

Distinct from its theories regarding the substance of the Second Engagement Letters and the disclosure of their terms, Plaintiff also alleges that Defendants committed malpractice when they "created false minutes of the February 28, 2012 meeting of CVR's board." (AC ¶ 49(f); *see*

15

*also id.* ¶ 29.)  Although, as noted above, Plaintiff also contradicts this allegation by pleading in the alternative, the fact remains that this is a serious accusation.  If true, Defendants' behavior would likely warrant referral to this Court's Grievance Committee or to the Departmental Disciplinary Committee for the First Department of the New York State Supreme Court. Nevertheless, while Plaintiff's allegations constitute a weighty charge with significant implications for Defendants' law licenses, they fail to state a claim for malpractice.

As noted above, malpractice liability requires that Plaintiff suffer "actual and ascertainable damages" traceable to Defendants' breach of the standards of professional conduct.  *Rubens*, 527 F.3d at 254–55.  Here, Plaintiff has not alleged any damages attributable to Defendants' supposed falsification of the February 28, 2012 board meeting minutes.  Plaintiff asserts that the falsified minutes were "drafted two months" after the February 28, 2012 board meeting (AC ¶ 29) and submitted to Plaintiff's board "[o]n or about May 2, 2012" (*id.* ¶ 40).  Given that chronology, the allegedly-doctored board minutes post-date all of the relevant acts that gave rise to Plaintiff's damages in this case – the ratification of the Second Engagement Letters, Pici's signing them, and Plaintiff's SEC disclosure.  Accordingly, because Plaintiff fails to plausibly allege any damages flowing from Defendants' falsification of the board meeting minutes, this malpractice theory must also be dismissed.

\*        \*        \*

Because all of Plaintiff's malpractice theories fail to state a claim, Plaintiff's First Amended Complaint must be dismissed.

## IV.  LEAVE TO AMEND

In its Opposition, Plaintiff requested leave to amend its complaint, but did not attach a proposed revised pleading.  *See, e.g.*, *Abercrombie v. Andrew Coll.*, 438 F. Supp. 2d 243, 275 (S.D.N.Y. 2006) ("[I]n making a motion for leave to amend, plaintiffs must attach a proposed

amended complaint so that the Court and the opposing party has an opportunity to understand the exact changes proposed."). Nor did Plaintiff set out any of the language it hoped to add to a new filing. Instead, Plaintiff explained the general categories of information that it sought to add in order to bolster its malpractice claim. (*See* Opp'n at 24–25). It was not until September 4, 2018 – more than two months after the original discovery deadline and following a series of contentious discovery disputes – that Plaintiff filed a pre-motion letter pursuant to the Court's Individual Rule 2.A seeking leave to file a second amended complaint. (Doc. No. 171.) In keeping with the Court's Individual Rules, Plaintiff attached to its pre-motion letter a copy of its proposed second amended complaint and a blackline comparing that complaint to the operative Amended Complaint. (Doc. Nos. 171-1, 171-2.) Plaintiff's proposed second amended complaint adds two new causes of action (for breach of contract and breach of the implied duty of good faith and fair dealing), sets out factual allegations in support of those new causes of action, and makes a few minor edits to Plaintiff's malpractice claims.

"Although Rule 15(a) of the Federal Rules of Civil Procedure provides that leave to amend 'shall be freely given when justice so requires,'" the Court "has discretion to deny leave for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007) (quoting Fed. R. Civ. P. 15(a)). A showing of delay that results in prejudice to the defendant can support denial of leave to amend. *Ruotolo v. City of New York*, 514 F.3d 184, 191–92 (2d Cir. 2008) (quoting *State Teachers Ret. Bd. v. Fluor Corp.*, 654 F.2d 843, 856 (2d Cir. 1981)). Moreover, leave to amend may be denied on the basis of futility where the proposed amended pleading "is legally insufficient on its face." *Pasternack v. Lab. Corp. of Am.*, 892 F. Supp. 2d 540, 549 (S.D.N.Y. 2012); *see also United States ex rel. Raffington v. Bon Secours Health Sys., Inc.*, 285 F. Supp. 3d 759, 766–67

17

(S.D.N.Y. 2018) ("Courts assess futility by determining whether the proposed claim could survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6).").

Here, Plaintiff's belated addition of its breach of contract and good faith and fair dealing claims smacks of bad faith and undue delay. Fact discovery in this case closed on July 27, 2018 (Doc. No. 154 ¶ 6), and would have ended earlier but for Plaintiff's conduct during discovery (*see* Doc. No. 149). And while Plaintiff states that it only learned of the basis for its proposed breach of contract claims in July 2018, it is hard to imagine what prevented Plaintiff from ascertaining a breach of its retention agreement with its own law firm prior to July 2018 – more than five years after Plaintiff first commenced a malpractice action against the firm in the District of Kansas. In any event, Plaintiff – which did not even hint at the possibility that it would seek to add a breach of contract claim during the discovery conference held on August 9, 2018 (Doc. No. 169) – provides *no* explanation as to why it waited until September 4, 2018, after the close of fact discovery, to file its pre-motion letter seeking leave to amend. *See Cresswell v. Sullivan & Cromwell*, 922 F.2d 60, 72 (2d Cir. 1990) ("The burden is on the party who wishes to amend to provide a satisfactory explanation for the delay.").

As Defendants point out, these new claims and assertions will likely require additional fact discovery in this five-year-old case. Indeed, Plaintiff does not even attempt to argue that fact discovery would not need to be reopened. (Doc. No. 174 at 2.) Instead, Plaintiff only asserts that *it* will not bear substantial further expense, because "there are clearly no additional documents to be produced" to Defendants. (Doc. No. 171 at 2.) That, of course, is not particularly relevant to the Court's prejudice analysis, which turns on the existence of "undue prejudice to the opposing party," not the movant. *McCarthy*, 482 F.3d at 200. Defendants will surely be forced to incur the costs associated with additional discovery – for example, by seeking to take *another* deposition of

18

CVR's General Counsel Gross concerning the terms of the retention agreement. (*See* Doc. No. 174 at 2; *see also* Doc. No. 161 (denying a motion to quash a deposition of Gross).)  Thus, Plaintiff's delay in seeking leave to amend, and the undue prejudice that Defendants will suffer as a result, would alone justify denial of Plaintiff's motion to add its contract and good faith and fair dealing claims.

But Plaintiff's motion to amend and add new contract claims also fails for its sheer futility. Put simply, Plaintiff's breach of contract theory is that Defendants' $6 million fee was based "on the amount of the Success Fees invoiced by Goldman [Sachs] and Deutsche [Bank]." (Doc. No. 171-1 ¶ 66.)  According to Plaintiff, that fee contravened the representations made by Defendants in their "Billing and Retention Policies," which were incorporated into an engagement letter that Defendants sent to CVR in January 2012. (*Id.* ¶¶ 19–20.)  In relevant part, Wachtell's "Billing and Retention Policies" provide:

> [W]e must base our fees not on time, but on the intensity of the firm's efforts, the responsibility assumed, the complexity of the matter, and the result achieved. Overall, we seek to obtain outstanding results for our clients for a fee that our clients will feel fairly values our services.
>
> . . . While our fees are not based on the amount involved in a matter, experience indicates that merger and acquisition and takeover fees have typically ranged 1% or more on matters under $250 million and .10 to 1% or less on matters over $25 million. . . . Statements for fees are rendered periodically or at the conclusion of a matter.  Interim statements for fees do not represent the final fee; they are on account of the final fee.

(*Id.* ¶ 20.)

Significantly, Plaintiff does not allege that the engagement letter or the Billing and Retention Policies set the final fee to be paid to Defendants.  In fact, there appears to be no dispute that the parties did not reach an agreement as to Defendants' fee until April 2012, when Defendants sent CVR an invoice for $6 million, which Plaintiff admits was "promptly paid," apparently

negotiation or dispute.  (*Id.* ¶¶ 21, 65.)  Consequently, it is difficult to discern exactly what contract is alleged to have been breached, let alone what the terms of that contract were with respect to fees.

It is axiomatic that claims for breach of contract and breach of the implied covenant of good faith and fair dealing – a variant of a breach of contract claim, *see Geler v. Nat'l Westminster Bank USA*, 770 F. Supp. 210, 215 (S.D.N.Y. 1991) – must arise out of a valid contract.  *See Small Bus. Bodyguard Inc. v. House of Moxie, Inc.*, 230 F. Supp. 3d 290, 302 (S.D.N.Y. 2017); *ARI & Co., Inc. v. Regent Int'l Corp.*, 273 F. Supp. 2d 518, 522 (S.D.N.Y. 2003).  And "a purported contract that leaves the compensation term to be determined by future negotiations is 'a mere agreement to agree,' [which] under New York law is deemed too indefinite to be enforceable." *Mar Oil, S.A. v. Morrissey*, 982 F.2d 830, 840 (2d Cir. 1993).  Therefore, because Plaintiff's proposed pleading does not allege that Defendants breached an enforceable agreement, it fails to state a claim upon which relief could be granted.  An amendment to add such allegations would clearly be futile.  *See Hayden v. County of Nassau*, 180 F.3d 42, 53 (2d Cir. 1999).

As for Plaintiff's request to amend its malpractice claims, the additions Plaintiff proposes do almost nothing to address the fatal deficiencies in Plaintiff's Amended Complaint discussed above.  The lone exception concerns Plaintiff's theory that Defendants committed malpractice in preparing Plaintiff's SEC 14D-9 disclosures.  In its Opposition, Plaintiff asserts that, if given the opportunity, it could amend its Amended Complaint to add express allegations that:

> Wachtell's negligent preparation of CVR's Form 14D-9 did not merely create a substantial risk of an [SEC] investigation, but . . . was reckless and otherwise grossly negligent, resulting in an investigation that cost over $1.5 million in legal fees and an order finding CVR in violation of SEC regulations.

(Opp'n at 24.)  Although not exactly a model of clarity, Plaintiff's statement seems to suggest that Plaintiff would add factual allegations related to the SEC's February 14, 2017 order, in which the

20

SEC concluded that the fees charged by Goldman Sachs and Deutsche Bank "were not customary, and the material terms of the compensation arrangement with [Goldman Sachs and Deutsche Bank] should have been disclosed."   (Doc. No. 135-1 at 2 ¶ 2.)   Since these findings post-date the Amended Complaint, the Court cannot say with certainty that a theory incorporating allegations based on the SEC's order would be futile, particularly given the SEC's express findings as to what is and is not "typical" and "customary" for success fees in the takeover context.   Moreover, since fact discovery with respect to the SEC investigation is now complete, there is no reason to think that Defendants will be prejudiced by the filing of a second amended complaint addressing that topic.   Accordingly, the Court will allow Plaintiff to amend its pleading *only* as to its SEC-disclosure theory.

## V. CONCLUSION

For the reasons set forth above, Defendants' motion for judgment on the pleadings is GRANTED.   Further, Plaintiff's request for leave to file a second amended complaint is GRANTED only as to Plaintiff's claim that Defendants committed malpractice in describing the fee terms of the Second Engagement Letters as "customary" in their SEC filings.   Plaintiff's motion to amend is otherwise DENIED.   Plaintiff shall file its amended complaint no later than October 12, 2018.

The Clerk of Court is respectfully directed to terminate the motions pending at docket numbers 128 and 171.

SO ORDERED.

Dated:       September 27, 2018
             New York, New York

RICHARD J. SULLIVAN
UNITED STATES DISTRICT JUDGE