UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CVR ENERGY, INC., | ) |
|                 Plaintiff, | ) No. 14-cv-06566 (RJS) |
| vs. | ) |
| | ) **Jury Trial Demanded** |
| WACHTELL LIPTON ROSEN & KATZ, | ) |
| BENJAMIN M. ROTH and | ) |
| ANDREW R. BROWNSTEIN, | ) |
|                 Defendants. | ) |

**SECOND AMENDED COMPLAINT[1]**

The Plaintiff, CVR Energy, Inc. ("CVR"), by and through the undersigned attorneys, states the following cause of action:

**I. NATURE OF THE CASE**

1. This is an action for professional malpractice against defendants Wachtell, Lipton, Rosen & Katz ("Wachtell") and two of its partners Benjamin M. Roth ("Roth") and Andrew R. Brownstein ("Brownstein").

2. On February 16, 2012 Carl C. Icahn ("Icahn") and his affiliates (the "Icahn Parties") commenced a $30 per share tender offer (the "Icahn Tender Offer") to acquire control of CVR. In May of 2012, pursuant to the Icahn Tender Offer they did acquire

---

[1] This Second Amended Complaint is being filed in its current form at the direction of the Court, per its September 28, 2018 and October 9, 2018 orders, which dismissed certain of Plaintiff's theories of liability in Plaintiff's cause of action for malpractice in Count One of the Amended Complaint and precluded Plaintiff from making (per Fed. R. Civ. P. 15) certain other, additional changes to this pleading. However, Plaintiff is filing this amended complaint with the understanding that it is not waiving its rights (which it expressly reserves) to appeal those orders, and to later file a further amended complaint (which would include those dismissed allegations and/or the other changes, including its claim for punitive damages and additional proximate cause ("but for") allegations), following either successful appeal or an order from the trial court granting the motion for reconsideration that Plaintiff is filing herewith.

1

control of CVR at $30 per share, the same price they offered when the Icahn Tender Offer started.

3. Wachtell, primarily through Roth and Brownstein, represented CVR regarding, among other things, the retention by CVR of Goldman Sachs & Co. ("Goldman") and Deutsche Bank Inc. ("Deutsche") to advise CVR in its response to the Icahn Tender Offer, as well as in connection with certain related, required filings with the Securities Exchange Commission ("SEC"). Wachtell has worked on numerous occasions in tandem with, and has represented, Goldman. In its representation of CVR, Wachtell failed to advise CVR that under the terms of the retention agreements entered with Goldman and Deutsche upon the advice of Wachtell, CVR would face claims by Goldman and Deutsche for $36 million even if the Icahn Parties succeeded in the Icahn Tender Offer and acquired control of CVR at the original $30 offer. The $36 million fees were double the fees that Goldman and Deutsche would charge if CVR remained independent. Had CVR and its Board understood this (and it was the duty of Wachtell to insure that they did), CVR would never have agreed to pay Goldman and Deutsche twice as much if the Icahn Parties won control of CVR than they would pay if CVR defeated the Icahn Parties. Indeed, the agreements entered by CVR with the advice of Wachtell and without approval of the CVR Board, created a perverse incentive for Goldman and Deutsche—and "perverse" is the very word that was in fact used by Wachtell lawyers in a private email message to characterize the incentive to promote CVR's defeat. Yet Wachtell never explained any of this to its client, CVR. Moreover, as detailed below, Wachtell negligently prepared certain disclosures required to be filed, pursuant to the federal securities laws, that created a risk of regulatory action and sanctions against CVR.

4. In short, but for defendants' dereliction of their professional obligations and duties to CVR, CVR would not have been in messy, expensive and substantial lawsuits for tens of millions of dollars with Goldman and Deutsche which resulted in a judgement against CVR and a subsequent settlement -, or have been the subject of an investigation by the SEC. [2]

## II. THE PARTIES

5. Plaintiff is a corporation organized under the laws of the State of Delaware with its corporate offices in the States of Kansas and Texas, from which its activities are directed.

6. Defendant Wachtell, Lipton, Rosen & Katz is a partnership, with its principal place of business in New York, New York.

7. Defendant Benjamin M. Roth, is now and, at all relevant times, has been a partner of Wachtell, and lives in the state of New Jersey. Although assisted from time to time by associate lawyers at Wachtell, Roth was individually and directly responsible for representation of CVR between January of 2012 and May of 2012.

8. Defendant Andrew R. Brownstein is now and, at all relevant times, has been a partner of Wachtell, and lives in the state of New York. Although assisted from time to time by associate lawyers at Wachtell, Brownstein was individually and directly responsible for representation of CVR between January of 2012 and May of 2012.

## III. VENUE AND JURISDICITON

9. Pursuant to 28 U.S.C. §1332, this Court has subject matter jurisdiction, as there is complete diversity of citizenship--defendants are not citizens of Delaware,

---

[2] Because of lack of approval of the fee terms by the CVR Board and other defenses, CVR contested Goldman and Deutsche's claims in the lawsuits.

Texas or Kansas, and there is more than $75,000 in controversy, exclusive of interest and costs.

10. There is no dispute that defendants are subject to the jurisdiction of this Court, to which this action was transferred from the U.S. District Court for the District of Kansas pursuant to 28 U.S.C. § 1631.

11. Pursuant to 28 U.S.C. § 1391, venue is proper in this District.

### IV.  MATERIAL FACTS

**A.  Background.**

12. In early January of 2012, the Icahn Parties announced that they had acquired a substantial minority stake in plaintiff, a public company engaged in the oil refining and fertilizer business.

13. CVR became concerned that the Icahn Parties or others might launch a proxy fight or tender offer to acquire a controlling interest in CVR and therefore decided to retain Deutsche and Goldman to assist CVR in connection with any attempts to acquire the stock or assets of CVR or to otherwise obtain control of CVR, including attempts to change the composition of CVR's Board of Directors by proxy, consent solicitation, or otherwise.

14. Pursuant to an engagement letter dated January 16, 2012 sent by defendant Roth to Edmund Gross, General Counsel of CVR, in Kansas City, Kansas, Wachtell, a firm noted for its defense of companies that are the target of proxy contests and hostile tender offers, agreed to advise CVR on all matters of "shareholder activism," including any matters relating to the activities of the Icahn Parties. Pursuant to that retention, defendants Roth and Brownstein assumed primary responsibility for CVR's representation.

15.     As CVR had no experience whatsoever in proxy contests and hostile tender offers, defendants knew, or should have known, that CVR would rely on Wachtell to protect its interests in the negotiation of fee terms with Goldman and Deutsche and to fully advise CVR as to the terms of the Engagement Letters.

**B.    The First Engagement Letters.**

16.     In engaging Deutsche and Goldman, the Board, with the assistance of Mr. Frank Pici ("Pici"), CVR's Chief Financial Officer, negotiated a flat $2 million fee for Goldman (with monthly payments of $100,000 credited against the $2 million), and a $1 million fee for Deutsche, for services in connection with a proxy fight and additional monthly payments of $100,000 for their advisory services, all in connection with a possible proxy fight and other efforts by the Icahn Parties to obtain control of CVR, which fees were reflected in the First Engagement Letters, signed by Mr. Pici.

17.     This was the only fee arrangement that the CVR Board ever thought was operative through any and all further attempts to take control of CVR, including a hostile tender offer, because defendants never advised CVR's Board as to the existence of the terms of the Second Engagement Letters, as alleged below.

**C.    Negotiation and Execution of the Second Engagement Letters.**

18.     On February 16, 2012, the Icahn Parties announced the "Tender Offer" for all CVR stock at $30 per share.

19.     As noted above, Goldman and Deutsche are currently suing CVR for approximately $40 million in fees in two separate lawsuits pending in New York Supreme Court. Goldman and Deutsche claim they are entitled to a substantial fee ("Success Fee"), as purportedly set forth in the Second Engagement Letters, based on the full enterprise value (the "Enterprise Value") of CVR because Icahn's Tender Offer (which

5

was completed at the same $30 per share price as it was launched) ultimately resulted in the acquisition of more than fifty percent of the shares of CVR.

20. Defendants had the obligation and responsibility to review the Second Engagement Letters, to accurately advise plaintiff of the fee terms of said Letters, and to that end, to actively participate in the negotiation and drafting of the Second Engagement Letters.

21. Nevertheless, defendants failed to inform Mr. Pici or anyone else at CVR of the effect of the fee terms, as alleged by Goldman and Deutsche in the Second Engagement Letters, to wit, that although Goldman and Deutsche had been retained to defend CVR from the success of the Icahn Parties' Tender Offer, the triggering events for a fee based on the Enterprise Value of CVR included a successful tender offer by the Icahn Parties (a tender offer resulting in the Icahn Parties owning more than fifty percent of the shares of CVR) even at the original $30 per share offer price.

22. Moreover, defendants neither informed the CVR Board of even the existence of the Second Engagement Letters, nor the fee terms of the Second Engagement Letters.

23. Upon the launch of the Tender Offer, Goldman and Deutsche told Mr. Pici that the time had come for a new engagement letter with fees relating to the defense of the Tender Offer and "success" fees if CVR was sold, the proposed terms of which defendants were fully aware.

24. Goldman and Deutsche sent Mr. Pici a one-page bullet point summary of proposed fees, titled "Raid Defense," which Wachtell also received, and which included

an "Independence Fee" of $9 million if CVR remained independent (applicable if the Tender Offer did not result in the Icahn Parties obtaining more than fifty percent of the stock of CVR or control of the Board through a proxy fight) and an Enterprise Value fee (expressed as a percentage of the value of CVR) if CVR was sold, denominated a "Sale Transaction."

25. The Raid Defense summary did not define "Sale Transaction," and neither Goldman, Deutsche, nor defendants explained to Mr. Pici that if the result of the Icahn Tender Offer was the acquisition of more than fifty percent of CVR's stock by the Icahn Parties, with no increase in the $30 per share consideration, the very result that Goldman and Deutsche were hired to prevent, then Goldman and Deutsche would consider even this event a "Sale Transaction," triggering the Enterprise Value fee, a fee that would amount to more than $18 million to each adviser.

26. Based on its own review of the Second Engagement Letters, in draft and final form, defendants knew or should have known that even if Goldman and Deutsche failed to defeat Mr. Icahn's $30 per share Tender Offer, a "Sale Transaction" would be considered by Goldman and Deutsche to have occurred, thus triggering the Enterprise Value fee, a fact that Wachtell failed to explain to Mr. Pici or anyone else at CVR.

27. In the absence of any other explanation of the meaning of "Sale Transaction," Mr. Pici understandably believed that "Sale Transaction" meant that if CVR determined to defend itself by throwing itself into the arms of a white knight rather than to have CVR succumb to the $30 per share Icahn Tender Offer (presumably at a price in excess of $30 per share offered by the Icahn Parties), then that would also

7

generate a fee for Goldman and Deutsche, a belief that Wachtell made no effort to correct.

28.  Similarly, Mr. Edmund Gross ("Gross"), General Counsel of CVR, the only other individual at CVR who was aware of the Second Engagement Letters (defendants had not even bothered to discuss the proposed fees with either Mr. Lipinski, the President of CVR, or the Board of Directors of CVR), did not understand that the Success Fee would result from the completion of the Icahn Tender Offer (according to Goldman and Deutsche), resulting in the acquisition of more than 50 percent of CVR stock.  Defendants never had any discussion with Mr. Gross concerning this subject.

29.  The Minutes of a February 28, 2012 meeting--drafted two months later by Wachtell lawyers and approved by Roth and Bronstein, after the CVR Board was informed for the first time that Goldman and Deutsche intended to charge CVR the Success Fee—included the following statement:

> Mr. Lipinski then requested that Mr. Roth of Wachtell Lipton provide an overview of the financial advisors' fees in connection with the Indigo matter. Mr. Roth explained to the Board that, under their respective engagement letters with the Company, each of Goldman Sachs and Deutsche Bank would receive a fee based on a percentage of the Company's enterprise value if the Company were sold and a different, fixed fee if the Company were to remain independent after the Indigo [Icahn] proxy context and tender offer. Mr. Roth noted that the financial advisors would also be entitled to payment for certain expenses, including their respective legal expenses. Following the discussion of advisory fees, Mr. Lipinski again called a break to the Board's discussion and stated that the Board would reconvene later that afternoon.

However, Roth never actually made this presentation in form or substance. In fact, neither Roth nor Brownstein, nor anyone else at Wachtell ever explained the new proposed fees to the Board of CVR, or even the existence of the Second Engagement

8

Letters, notwithstanding, remarkably, having attended every CVR Board meeting from January to late April 2012.³

30.     On or about March 1, 2012, Wachtell caused and advised CVR to file a required S.E.C. form "14D-9" under the federal securities laws, which characterized the fee terms entered into with Goldman Sachs and Deutsche Bank as "customary," when in fact Wachtell knew or should have known that (a) there was at least a substantial question as to whether they were customary and (b) CVR's Board had no knowledge of the specifics of those fee terms, especially the substantial fees Goldman Sachs and Deutsche Bank would claim in the event that the Icahn Tender Offer resulted in the acquisition of more than fifty percent of the stock of CVR.

31.     Beginning on March 2, 2012, drafts of the Second Engagement Letters were circulated among Deutsche, Goldman, Wachtell, and Mr. Gross. In connection with these drafts and subsequent revisions, defendants failed to explain to anyone at CVR that under the Second Engagement Letters, Deutsche and Goldman could claim the Enterprise Value fee if they **failed** in their efforts to prevent the Icahn Parties from acquiring more than fifty percent of CVR's stock.

32.     In late March, Mr. Pici signed the Second Engagement Letters, having received no advice whatsoever from defendants regarding their fee terms, other than being advised by Wachtell that the letters were "OK" to sign. Moreover, although drafts of the Second Engagement Letters were vetted and revised by defendants, they

---

³ The statement quoted from the Minutes is, in any event, highly misleading, inaccurate, and incomplete because: (a) as of February 28, the only Engagement Letters in place were the First Engagement Letters; (b) no drafts of Second Engagement Letters had even been circulated; (c) without further explanation, the phrase "if the Company were sold" could only be reasonably interpreted by the listener as a sale of CVR, not the completion of Mr. Icahn's $30 per share Tender Offer; and (d) there is no mention even of the amount of the new fees. These factors only further demonstrate that Roth never made the presentation attributed to him in these Minutes.

9

neither proposed nor made any changes to the fee terms, and they failed to explain the fee terms to anyone at CVR, whom they knew had absolutely no experience retaining advisors to defend in hostile takeover battles.

33. Throughout this time period, the CVR Board only knew (and defendants did not inform the Board otherwise) that in January 2012 Deutsche and Goldman had been retained to advise CVR on defending against any Icahn efforts to obtain control of CVR for a flat fee of no more than $4 million in total and reasonably believed that this was the total amount of fees to be paid to Deutsche and Goldman. Only after the CVR Board realized that the Icahn Tender Offer would succeed in April, a month after Mr. Pici had signed the Second Engagement Letters with Deutsche and Goldman, did the Board learn that Deutsche and Goldman, incredibly, would claim entitlement to the success fee, based on their **failure** to defeat Mr. Icahn, and claim that a successful Icahn Tender Offer, even at his original $30 per share price, constituted a "sale", based on Goldman and Deutsche's interpretation of the Second Engagement Letters.

**D.     Events following the signing of the Second Engagement Letters.**

34. By mid-April, it became clear that the Icahn Parties would obtain ownership of more than fifty percent of CVR's stock in response to their $30 per share Tender Offer. The CVR Board, aware of the inevitable success of the Tender Offer, instructed Wachtell to meet with Icahn representatives to negotiate the process of the closing of the Tender Offer.

35. Once it became clear that an agreement ("Transaction Agreement") for closing of the Tender Offer with the Icahn Parties was about to be completed, Mr. Pici took another look at the Second Engagement Letters on April 17, 2012 and realized, for the first time, that Deutsche and Goldman might claim that they were entitled to the

10

Enterprise Value fee. Significantly, neither Roth nor Brownstein, nor anyone else at Wachtell bothered to tell Mr. Pici or anyone else at CVR that on April 14, 2012 Wachtell lawyers had prepared a chart of fees under the Second Engagement Letters, a chart that they, including Roth and Brownstein, concealed from CVR. The defendants did not inform the Board at its April 18, 2012 meeting, where the Board approved the Transaction Agreement with Mr. Icahn, of the fees that Goldman and Deutsche would claim they were entitled to as a result of the successful Tender Offer. In fact, one of the lawyers at Wachtell, who actively participated with Roth and Brownstein in Wachtell's representation of CVR, noted in an email to another lawyer at Wachtell on April 14, 2012, while preparing the chart of fees under the Second Engagement Letters, that Goldman and Deutsche's alleged entitlement to the Enterprise Value fee upon completion of the Icahn Tender Offer at the original $30 per share price represented a "perverse incentive."

36. Notwithstanding the fact that defendants well knew Goldman and Deutsche would claim entitlement to the Success Fees, defendants also prepared for the Board's adoption on April 18, 2012 a boiler plate resolution that approved paying fees to Goldman and Deutsche (as well as $6 million for Wachtell) without bothering to explain to the CVR Board that the fees Goldman and Deutsche would charge were not the fees set forth in the First Engagement Letters, but the fees set forth in the Second Engagement Letters.

37. After the conclusion of the Board call/meeting approving the signing of the Transaction Agreement on April 18, 2012, the Board remained on the call with Mr.

11

Gross and Mr. Pici; Goldman, Deutsche, and defendants having dropped off. Mr. Pici then disclosed to the Board for the first time the existence of the Second Engagement Letters and the possibility that Goldman and Deutsche would bill CVR for the Enterprise Value fee of more than $18 million each. Shocked that Mr. Pici had entered into the Second Engagement Letters without Board approval and that the Board had not been informed of the Second Engagement Letters or these fees by defendants, the Board instructed Mr. Pici to contact Goldman and Deutsche to request that they not bill the Enterprise Value fees. Goldman and Deutsche thereafter refused to not charge the Enterprise Value fees.

38. On or about April 23, 2012, Wachtell caused and advised CVR to file a required form 14D-9 under the federal securities laws, which characterized the fee terms entered into with Goldman Sachs and Deutsche Bank as "customary," when in fact Wachtell knew that (a) there was at least a substantial question as to whether they were customary, and (b) CVR's Board had no knowledge of the specifics of those fee terms, especially the substantial fees Goldman Sachs and Deutsche Bank would claim in the event that the Icahn Tender Offer resulted in the acquisition of more than fifty percent of the stock of CVR.

39. With respect to both form 14D-9 filings, CVR relied completely on Wachtell's advice in believing the disclosures referenced above were appropriate and in compliance with the law.

40. On or about May 2, 2012, defendants submitted to the Board for the first time and in bulk draft Minutes of the Board meetings since February 2012, including what purported to be Minutes of the Board meetings of February 28 and April 18, 2012

without calling the Board's attention to (a) the false statement in the February 28 Minutes that Roth of Wachtell had made a presentation to the Board summarizing the fee terms of the Second Engagement Letters and (b) the boilerplate resolution in the April 18 Minutes purportedly authorizing CVR to pay fees to Goldman and Deutsche, which Wachtell knew would be more than $18 million each, based on Goldman and Deutsche's interpretation of the Second Engagement (an interpretation with which defendants agreed, as evidenced by the chart Wachtell lawyers had prepared on April 14, 2012).

41. On or about May 3, 2012, in anticipation of the closing of the Tender Offer and the replacement of the CVR Board with Icahn appointed new members, Goldman and Deutsche submitted their invoices to CVR for a total of more than $36 million, based on their calculation of the Enterprise Value of CVR. Upon receiving the invoices, the CVR Board, knowing that the new Icahn-appointed Board would be installed on May 7, 2012, decided to defer consideration of the invoices to the new Board. This deferral was confirmed with Icahn representatives, who informed Mr. Lipinski that the invoices should not be paid, pending review of all of the facts and circumstances by the new Board. That new CVR Board, after reviewing all of the facts and circumstances and consulting with newly retained outside counsel, did not approve the invoices for payment.

42. Shortly thereafter, Mr. Lipinski, CVR's Chairman, called Brownstein and asked for an explanation of what had occurred, as described above. Brownstein refused to respond substantively to Mr. Lipinski and stated that Wachtell no longer represented CVR and CVR should consult other counsel.

43. In 2014, the SEC initiated an investigation of CVR concerning whether the above-described form 14D-9 disclosures were appropriate and in compliance with the law.

44. In late January 2015, after CVR produced hundreds of thousands of documents to the SEC, the SEC informed CVR that it intended to take depositions under oath of numerous present and former employees, and present and former members of CVR's Board of Directors. The SEC took depositions, heard presentations from counsel, and ultimately proceeded with cease-and-desist proceedings against CVR as a result of Wachtell's negligent and improper advice to CVR regarding the disclosures set forth in the Form 14D-9s.

45. In January 2017, the SEC issued a cease-and-desist order against CVR – attached as **"Exhibit 1"** hereto – finding, *inter alia*, that "CVR shareholders were unaware of potential conflicts of interest that stemmed from the Banks' fee arrangements" and that "[b]y failing to fully and accurately disclose the material terms of the Banks' compensation in its initial and 10th Amended Schedule 14D-9, CVR violated Exchange Act Section 14(d)(4) and Rule 14d-9 thereunder" and that the banks' compensation arrangements under the Second Engagement Letters, were, in fact, not "customary."

46. More specifically, the cease-and-desist order stated (at p.2, ¶ 1), *inter alia*, that:

> "Given the retainer agreements' expansive definition of success, the specific financial terms of the Banks' retention should have been disclosed to investors pursuant to Item 5 of CVR's Schedule 14D-9, which requires a target issuer to provide a summary of the material terms of the compensation arrangements for its advisors hired to assist with the issuer's response to a tender offer. Instead, CVR merely stated in its Schedule 14D-9, which was prepared by its outside legal counsel ("Outside Counsel"), that

14

the terms of the Banks' retention were "customary." To the contrary, it was not customary for the Banks to receive a success fee in this situation and, accordingly, the fee arrangements should have been described in greater detail in order to comply with SEC disclosure rules"

47. The cease-and-desist order then proceeded to state (at p.2, ¶ 2) that:

"Due to the inadequate disclosure of the Banks' fees, CVR shareholders were unaware of potential conflicts of interest that stemmed from the Banks' fee arrangements as they considered the Activist Investor's tender offer. This information was material to investors because the Banks' fees increased dramatically if the company was sold, regardless of (i) whether the sale price was deemed by the board to be adequate, (ii) whether the Banks succeeded in defending against the Activist Investor's bid, or (iii) whether the Banks were successful in causing the Activist Investor to raise his bid. More typically, sale fees are obtained by investment banks in tender offer situations only when the banks' services result in the shareholders retaining their shares or obtaining appropriate value for their shares through a tender offer or other sale of the company. Such fee arrangements customarily align the financial interests of the banks with those of the shareholders by increasing fees only when the services of the banks have fully protected the value of the shareholders' interest in the company. Because the fee arrangement with the Banks that ensured a so-called success fee regardless of whether shareholders obtained fair value for their shares, the interests of the Banks and CVR's shareholders diverged. The Banks' fees were not customary, and the material terms of the compensation arrangement with the Banks should have been disclosed

48. This finding by the SEC that the investment banks' fees were not customary, and that it was a violation of the federal securities laws to publicly disclose them as such or otherwise disclose the actual fee terms, was a failure caused by defendants that not only resulted in a burdensome investigation and cease-and-desist order, but also misled CVR's management and board.

### COUNT I.  PROFESSIONAL MALPRACTICE

49. Plaintiff realleges Paragraphs 1-48, above.

50. On January 16, 2012, by letter to Mr. Gross, in Kansas City, Kansas, Wachtell agreed to represent CVR in all matters relating to Mr. Icahn and affiliates'

15

stock ownership in CVR and potential future "activism" for an initial fee of $200,000 and estimated future fees of as much as $6 million.

51. By virtue of its representation of plaintiff, defendants owed plaintiff a duty of due care, prudent advice, and representation of plaintiff in plaintiff's best interests.

52. On information and belief, Wachtell's long-standing relationship with Goldman in jointly representing companies that were the targets of proxy contests and hostile tender offers, affected its professional competence and judgment in its representation of CVR regarding the fee terms of the Second Engagement Letters, including the preparation of the inaccurate Minutes of the February 28, 2012 CVR Board meeting, the preparation of a resolution approving fees to Goldman and Deutsche at the April 18, 2012 Board meeting, and the gross failure to inform CVR of the existence of the Second Engagement Letters and their perverse fee terms.

53. Defendants were negligent and breached their duties to plaintiff and fell below the standard of care applicable to lawyers, including, but not limited to the following:

    a. Defendants knew that CVR and its management had no prior experience with respect to Proxy Contests or hostile tender offers, yet took no action to competently represent CVR in negotiating fair and appropriate fee terms with Goldman and Deutsche or explaining the terms of the Second Engagement Letters prepared by Goldman and Deutsche;

    b. Defendants never advised the CVR Board about the existence or terms of the Second Engagement Letters;

    c. Although the Second Engagement Letters were addressed to Mr. Lipinski, defendants never communicated any of their terms to Mr. Lipinski or

16

even informed him of their existence;

  d. Defendants negligently and affirmatively misadvised and otherwise failed to explain to anyone at CVR, including Messrs. Mr. Pici and Mr. Gross and the CVR Board, the fee terms of the Second Engagement Letters;

  e. Defendants negligently and affirmatively misadvised and otherwise failed to explain to anyone at the CVR, including Mr. Pici and Mr. Gross and the CVR Board, that Goldman and Deutsche believed that the fee terms of the Second Engagement Letters would entitle them to fees based on the Enterprise Value of CVR in the event the Tender Offer resulted in the acquisition of more than fifty percent of the stock of CVR;

  f. Defendants created false minutes of the February 28, 2012 meeting of CVR's Board, as described above; any statements attributed to Wachtell in the aforesaid Minutes were false and misleading in that they (a) falsely represented that the existing engagement letters provided for the fees described, (b) omitted to disclose that a sale of the Company included a successful acquisition of control of CVR as a result of the Tender Offer;

  g. Defendants negligently and recklessly presented a resolution to the Board on April 18, 2012 approving fees to be paid Goldman and Deutsche, without disclosing that Goldman and Deutsche would claim entitlement to the Enterprise Value fees;

  h. Defendants otherwise failed to represent CVR's best interests with respect to the fee terms of the Second Engagement Letters, as described in detail above;

  i. Defendants "washed their hands" of any responsibility for what had

17

occurred by informing Mr. Lipinski that CVR needed to retain separate counsel to deal with the fee claims of Goldman and Deutsche; and

    j.   Defendants negligently misadvised and otherwise caused CVR to file form 14D-9s, including the one on March 1, 2012, that said the Second Engagement Letters (which were entered into later that month) were "customary," an act of gross negligence that caused the company to enter into them and created the substantial risk, which materialized, that the SEC would initiate an investigation into the adequacy and sufficiency of the disclosures regarding the fee terms entered into between CVR and Goldman Sachs and Deutsche Bank, and the considerable risk that government enforcement action would be taken against CVR, which also materialized and resulted in a cease-and-desist order.

54.   Defendants' wrongful conduct proximately caused economic loss to CVR, including but not limited to (a) monetary loss occasioned by settlement in the aforesaid actions in the Supreme Court of New York, and (b) certain legal fees and costs arising out of the SEC investigation.

55.   By reason of defendants' wrongful conduct, Plaintiff is also entitled to the return of the $6 million fee it has paid to Wachtell.

56.   On information and belief, by virtue of defendants' long-standing relationship with Goldman, defendants, recklessly or intentionally, ignored CVR's legitimate best interests and preferred the best interests of Goldman and Deutsche to the exclusion and/or detriment of CVR's best interests, all as described in detail above.

57.   Plaintiff requests trial to a jury on all factual issues.

WHEREFORE, plaintiff prays for a judgment in its favor and against defendants as follows:

    a.     Damages as a court and jury deem appropriate; and

    b.     Costs, attorneys fees, and such other relief as the Court deems appropriate under law.

Dated: October 12, 2018

LAW OFFICES OF HERBERT BEIGEL

By: /s/ Herbert Beigel
Herbert Beigel
38327 S. Arroyo Way
Tucson, AZ 85739
520-825-1995
Fax: (520) 844-6215

767 Fifth Avenue, #4700
New York, New York 10153