# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| CVR ENERGY, INC., | ) | |
| | ) | |
| Plaintiff, | ) | No. 14-cv-06566 (RJS) |
| vs. | ) | |
| | ) | |
| | ) | **Jury Trial Demanded** |
| WACHTELL LIPTON ROSEN & KATZ, | ) | |
| BENJAMIN M. ROTH and | ) | |
| ANDREW R. BROWNSTEIN, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>THIRD AMENDED COMPLAINT</u> [1]

Plaintiff, CVR Energy, Inc. ("CVR"), by and through the undersigned attorneys, files

this Third Amended Complaint pursuant to Fed. R. Civ. P. 15 to add to the pending

malpractice claim against defendants allegations reflecting the extensive evidence of

---

[1] CVR has the right to file this Third Amended Complaint, per Fed. R. Civ. P. 15(a)(1)(B), as of the date appearing below, which is within 21 days after service of defendant's (October 30, 2018) motion under Rule 12(b)(6), as it represents Plaintiff's first amendment as a matter of course (its prior two amendments being "Other Amendments," per Fed. R. Civ. P. 15(a)(2), made with the written consent of defendants (the first amendment) and with the court's leave (the second amendment)). *See Ramirez v. City of San Bernadino*, 806 F.3d 1002 (9th Cir. 2015). However, CVR is refraining from so filing so as not to violate the Court's scheduling order, which requires any amended complaint to be filed only with leave of Court (albeit an order not permitted by Fed. R. Civ. P. 16 and otherwise contrary to Rule 16(b)(1)), as it was entered before any Rule 26(f) or consultation with the parties' attorneys). CVR submits this Third Amended Complaint without conceding that its Second Amended Complaint (or its First Amended Complaint) does not already satisfy the general rules of pleading set forth in Fed. R. Civ,. P. 8, which require merely a "short and plain statement" of the claim, or that it otherwise does not state a claim to relief that is plausible on its face and satisfies the pleading standards set forth in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007).

Furthermore, this Third Amended Complaint is submitted in its current form with the understanding and the intent that, by doing so, Plaintiff does not waive  its rights (which it expressly reserves) to appeal the prior orders of the Court relating to CVR's Proposed Second Amended Complaint, including the additional causes of action, the claim for punitive damages and additional proximate cause ("but for") allegations), following either successful appeal or an order from the trial court granting the motion for reconsideration that Plaintiff has filed.

malpractice obtained during the litigation's discovery period, including the sworn testimony of Defendants.

## NATURE OF THE CASE

1.     This is an action for professional malpractice against defendants Wachtell, Lipton, Rosen & Katz ("Wachtell") and two of its partners Benjamin M. Roth ("Roth") and Andrew R. Brownstein ("Brownstein").

2.     On February 16, 2012 Carl C. Icahn ("Icahn") and his affiliates (the "Icahn Parties") commenced a $30 per share tender offer (the "Icahn Tender Offer") to acquire control of CVR. In May of 2012, pursuant to the Icahn Tender Offer they did acquire control of CVR at $30 per share, the same price they offered when the Icahn Tender Offer started.

3.     Wachtell, primarily through Roth and Brownstein, represented CVR regarding, among other things, the retention by CVR of Goldman Sachs &    Co. ("Goldman") and Deutsche Bank Inc. ("Deutsche") to advise CVR in its response to the Icahn Tender Offer, as well as in connection with certain related, required filings with the Securities Exchange Commission ("SEC").  Wachtell has worked on numerous  occasions in tandem with, and has represented, Goldman.  In its representation of CVR, Wachtell failed to advise CVR that under the terms of the retention agreements entered with Goldman and Deutsche upon the advice of Wachtell, CVR would face claims by Goldman and Deutsche for $36 million even if the Icahn Parties succeeded in the Icahn Tender Offer and acquired control of CVR at the original $30 offer. The $36 million  fees were double the fees that Goldman and Deutsche would charge if CVR remained independent. Had CVR and its Board understood this (and it was the duty of Wachtell to insure that

they did), CVR would never have agreed to pay Goldman and Deutsche twice as much if the Icahn Parties won control of CVR than they would pay if CVR defeated the Icahn Parties.  Indeed, the agreements entered by CVR with the advice of Wachtell and without approval of the CVR Board, created a perverse incentive for Goldman and Deutsche— and "perverse" is the very word that was in fact used by Wachtell lawyers in a private email message to characterize the incentive to promote CVR's defeat. Yet Wachtell never explained any of this to its client, CVR.

4.    Furthermore, as detailed below, Wachtell negligently prepared certain disclosures required to be filed pursuant to the federal securities laws, that described as "customary" the perverse and non-customary fees the Banks stood to receive. Wachtell knew or should have known that those disclosures created a risk of  regulatory action and sanctions against CVR, and, worse still,  they misled CVR as to what fees the Banks would claim if the Icahn Parties won control of CVR.  Moreover, Wachtell knew or should have known those perverse and non-customary fee terms created a conflict of interest, as Wachtell would later justify its own fee based on the higher bank fees those perverse terms would generate (which was never disclosed to CVR), even if the Icahn Parties gained control of CVR – the opposite of CVR's express goal to defeat the Icahn tender. Indeed, CVR's goal was the *raison d'etre* for retaining Wachtell, who promoted its ability to assist companies like CVR to stave off hostile tender offers by activist shareholders, particularly Mr. Icahn. In short, but for defendants' dereliction of their professional obligations  and duties to CVR, CVR would not have been in messy, expensive and substantial lawsuits for tens of millions of dollars with Goldman and Deutsche, which resulted in a judgment against CVR and a subsequent settlement, or  have been the

subject of an investigation by the SEC.[2]

## I. THE PARTIES

5.      Plaintiff is a corporation organized under the laws of the State of Delaware with its corporate offices in the States of Kansas and Texas, from which its activities are directed.

6.      Defendant Wachtell, Lipton, Rosen & Katz is a partnership, with its principal place of business in New York, New York.

7.      Defendant Benjamin M. Roth, is now and, at all relevant times, has been a partner of Wachtell, and lives in the state of New Jersey. Although assisted from time to time by associate lawyers at Wachtell, Roth was individually and directly responsible for representation of CVR between January of 2012 and May of 2012.

8.      Defendant Andrew R. Brownstein is now and, at all relevant times, has been a partner of Wachtell, and lives in the state of New York. Although assisted from time to time by associate lawyers at Wachtell, Brownstein was individually and directly responsible for representation of CVR between January of 2012 and May of 2012.

## II. VENUE AND JURISDICITON

9.      Pursuant to 28 U.S.C. §1332, this Court has subject matter jurisdiction, as there is complete diversity of citizenship--defendants are not citizens of  Delaware, Texas or Kansas, and there is more than $75,000 in controversy, exclusive of interest and costs.

10.      There is no dispute that defendants are subject to the jurisdiction of this Court, to which this action was transferred from the U.S. District Court for the District of

---

[2] Because of lack of approval of the fee terms by the CVR Board and other defenses, CVR contested Goldman and Deutsche's claims in the lawsuits.

Kansas pursuant to 28 U.S.C. § 1631.

11.    Pursuant to 28 U.S.C. § 1391, venue is proper in this District.

### III.  MATERIAL FACTS

**A.    Background.**

12.    In early January of 2012, the Icahn Parties announced that they had acquired a substantial minority stake in plaintiff, a public company engaged in the oil refining and fertilizer business.

13.    CVR became concerned that the Icahn Parties or others might launch a proxy fight or tender offer to acquire a controlling interest in CVR and therefore decided to retain Deutsche and Goldman to assist CVR in connection with any attempts to acquire the stock or assets of CVR or to otherwise obtain control of CVR, including attempts to change the composition of CVR's Board of Directors by proxy, consent solicitation, or otherwise.

14.    Pursuant to an engagement letter dated January 16, 2012 sent by defendant Roth to Edmund Gross, General Counsel of CVR, in Kansas City, Kansas, Wachtell, a firm noted for its defense of companies that are the target of proxy contests and hostile tender offers, agreed to advise CVR on all matters of "shareholder activism," including any matters relating to the activities of the Icahn Parties. Pursuant to that retention, defendants Roth and Brownstein assumed primary responsibility for CVR's representation.

15.    As CVR had no experience whatsoever in proxy contests and hostile tender offers, defendants knew, or should have known, that CVR would rely on Wachtell to protect its interests in the negotiation of fee terms with Goldman and Deutsche and to

fully advise CVR as to the terms of the Engagement Letters.

**B.   The First Engagement Letters.**

16.     In engaging Deutsche and Goldman, the Board, with the assistance of  Mr. Frank Pici ("Pici"), CVR's Chief Financial Officer, negotiated a flat $2 million fee for Goldman (with monthly payments of $100,000 credited against the $2 million), and a $1 million fee for Deutsche, for services in connection with a proxy fight and additional monthly payments of $100,000 for their advisory services, all in connection with a possible proxy fight and other efforts by the Icahn Parties to obtain control of CVR,  which fees were reflected in the First Engagement Letters, signed by Mr. Pici.

17.     This was the only fee arrangement that the CVR Board ever thought was operative through any and all further attempts to take control of CVR, including a hostile tender offer, because defendants never advised CVR's Board as to the existence of the terms of the Second Engagement Letters, as alleged below.

**C.   Negotiation and Execution of the Second Engagement Letters.**

18.     On February 16, 2012, the Icahn Parties announced the "Tender Offer" for all CVR stock at $30 per share.

19.     As noted above, Goldman and Deutsche sued CVR for approximately $40 million in fees in two separate lawsuits in New York Supreme Court. Goldman and Deutsche claimed they were entitled to a substantial fee ("Success Fee"), as purportedly set forth in the Second Engagement Letters, based on the full enterprise value (the "Enterprise Value") of CVR because Icahn's Tender Offer (which was completed at the same $30 per share price as it was launched) ultimately resulted in the acquisition of more than fifty percent of the shares of CVR.

20.     Defendants had the obligation and responsibility to review the Second

Engagement Letters, to accurately advise plaintiff of the fee terms of said Letters, and to that end, to actively participate in the negotiation and drafting of the Second Engagement Letters.

21.     Nevertheless, defendants failed to inform Mr. Pici or anyone else at CVR of the effect of the fee terms, as alleged by Goldman and Deutsche in the Second Engagement Letters, to wit, that although Goldman and Deutsche had been retained to defend CVR from the success of the Icahn Parties' Tender Offer, the triggering events for a fee based on the Enterprise Value of CVR included a successful tender offer by the Icahn Parties (a tender offer resulting in the Icahn Parties owning more than fifty percent of the shares of CVR) even at the original $30 per share offer price.

22.     Moreover, defendants neither informed the CVR Board of even the existence of the Second Engagement Letters, nor the fee terms of the Second Engagement Letters.

23.     Upon the launch of the Tender Offer, Goldman and Deutsche told Mr. Pici that the time had come for a new engagement letter with fees relating to the defense of the Tender Offer and "success" fees if CVR was sold, the proposed terms of which defendants were fully aware.

24.     Goldman and Deutsche sent Mr. Pici a one-page bullet point summary of proposed fees, titled "Raid Defense," which Wachtell also received, and which  included an "Independence Fee" of $9 million if CVR remained independent (applicable if the Tender Offer did not result in the Icahn Parties obtaining more than fifty percent of the stock of CVR or control of the Board through a proxy fight) and an Enterprise Value fee (expressed as a percentage of the value of CVR) if CVR was sold, denominated a "Sale Transaction."

25.     The Raid Defense summary did not define "Sale Transaction," and neither Goldman, Deutsche, nor defendants explained to Mr. Pici that if the result of the Icahn Tender Offer was the acquisition of more than fifty percent of CVR's stock by the Icahn Parties, with no increase in the $30 per share consideration, the very result that Goldman and Deutsche were hired to prevent, then Goldman and Deutsche would consider even this event a "Sale Transaction," triggering the Enterprise Value fee, a fee that would amount to more than  $18 million to each adviser.

26.     Based on its own review of the Second Engagement Letters, in draft and final form, defendants knew or should have known that even if Goldman and Deutsche failed to defeat Mr. Icahn's $30 per share Tender Offer, a "Sale Transaction" would be considered by Goldman and Deutsche to have occurred, thus triggering the Enterprise Value fee, a fact that Wachtell failed to explain to Mr. Pici or anyone else at CVR.

27.     The Minutes of a February 28, 2012 meeting--drafted two months later by Wachtell lawyers and approved by Roth and Bronstein, after the CVR Board was informed for the first time that Goldman and Deutsche intended to charge CVR the Success Fee— included  the following statement:

> Mr. Lipinski then requested that Mr. Roth of Wachtell Lipton provide an overview of the financial advisors' fees in connection with the Indigo matter. Mr. Roth explained to the Board that, under their respective engagement letters with the Company, each of Goldman Sachs and Deutsche Bank would receive a fee based on a percentage of the Company's enterprise value if the Company were sold and a different, fixed fee if the Company were to remain independent after the Indigo [Icahn] proxy context and tender offer. Mr. Roth noted that the financial advisors would also be entitled to payment for certain expenses, including their respective legal expenses. Following the discussion of advisory fees, Mr. Lipinski again called a break to the Board's discussion and stated that the Board would reconvene later that afternoon.

However, Roth never actually made this presentation in form or substance. In fact, neither

Roth nor Brownstein, nor anyone else at Wachtell ever explained the new proposed fees to the Board of CVR, or even the existence of the Second Engagement Letters, notwithstanding, remarkably, having attended every CVR Board meeting from January to late April 2012.[3]  Moreover, everyone, other than Roth, who attended that meeting and testified in the Bank and current litigation stated unequivocally under oath that Roth never gave any explanation of the fee terms.  The testifying witnesses included three members of CVR's Board at that time – George Matelich, Mark Tomkins, and CVR's then CEO, Jack Lipinski – as well as its then-CFO, Frank Pici.  And other witnesses have also stated that no such presentation was made. On the other hand, Wachtell has not identified a single non-Wachtell witness to corroborate Roth.

## D.     SEC Regulation M-A and the Form 14D-9 Disclosures

28.     On March 1, 2012, Wachtell caused and advised CVR to file a required S.E.C. form "14D-9" under the federal securities laws.  Under then applicable SEC rules, a public company that is the target of a tender offer is required to express a position on the tender offer by filing a solicitation or recommendation statement on Schedule 14D-9 with the SEC. In addition, Item 5 of Schedule 14D-9 (which incorporates Item 1009(a) of Regulation M-A) requires the target of the tender offer to "[i]dentify all persons and classes of persons that are directly or indirectly employed, retained, or to be compensated to make solicitations or recommendations in connection with the

---

[3] The statement quoted from the Minutes is, in any event, highly misleading, inaccurate, and incomplete because: (a) as of February 28, the only Engagement Letters in place were the First Engagement Letters; (b) no  drafts of Second Engagement Letters had even been circulated; (c) without further explanation, the phrase "if the Company were sold" could only be reasonably interpreted by the listener as a sale of CVR, not the completion of  Mr. Icahn's $30 per share Tender Offer; and (d) there is no mention even of the amount of the new fees. These factors only further demonstrate that Roth never made the presentation attributed to him in these Minutes.

transaction" and "[p]rovide a summary of all material terms of employment, retainer or other arrangement for compensation."

29.     But Wachtell knowingly failed to comply with this rule, and failed to inform anyone at CVR, including its General Counsel, Mr. Gross (who had reviewed the Form 14D-9), that it was doing so – and thereby failed to exercise the ordinary and reasonable skill and knowledge commonly possessed by a member of the legal profession – resulting in the SEC Investigation and the SEC's cease-and-desist order.

30.     ███████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████

31.     Worse still, Wachtell knew or should have known that the disclosure was inaccurate regardless because, as of the time of such wrongful disclosure (March 1, 2012), no Second Engagement letters had even been drafted or signed by CVR, and that the fee terms Pici had negotiated with the Banks called for an enhanced fee to the Banks upon a "sale" of CVR, not a mere "change of control".  Accordingly, Wachtell knew or should have known that the wrongful disclosure would mislead not just the shareholders and financial markets, but also CVR management, including Pici and Gross, and the Board.

32.     Moreover, even if Wachtell believed that it was appropriate to simply state that the fee terms were "customary," they were duty bound in the exercise of the ordinary, reasonable skill and knowledge commonly possessed by a member of the legal profession to explain to Pici, Gross, and the CVR Board that a sale transaction, as stated

in the Raid Defense memo, would include the acquisition by Icahn of more than fifty percent of CVR's shares, which Wachtell failed to do.

33.     In fact, even accepting as true the Minutes of the February 28 meeting, Roth admitted that he did not explain  what "sale of the Company" meant or included, especially significant because at that time there was not even a draft of the Second Engagement Letters, nor were there drafts on March 1, when the 14d-9 was filed.  And the fact that the subsequent drafts did define a "sale" transaction did not absolve Defendants of their duty to explain that to the Board, which they did not do, and having attended every subsequent Board meeting, they knew or should have known that the Board never saw the Second Engagement Letters, and there was no further explanation of the terms after February 28.

34.     Wachtell knew or should have known that the Second Engagement Letters required the approval of the Board because (a) the Banks were well aware as a result of conversations with Pici (in connection with at least the First Engagement Letters) that Board approval was required, and Wachtell was in daily communication with the Banks during late February and March, (b) the only reason Roth would have made any presentation to the Board was because he knew Board approval was required, (c) he knew that the Second Engagement Letters were addressed to Mr. Lipinski, who was Chairman of the Board, but Roth had no conversations with Mr. Lipinski about the fee terms, (d) by reason of Roth's extensive experience, he knew or should have known that public companies do not typically authorize the Chief Financial Officer to enter into contracts that could involve the payment of tens of millions of dollars without a board resolution, (e) no resolution was presented to the Board authorizing Pici to sign the Second Engagement Letters, and (f) Roth was aware that the Board did not agree to the

initial fee proposals in connection with the First Engagement Letters.

35.     The inevitable result of the wrongful 14D-9 disclosure, the failure to advise CVR about its non-compliance with SEC rules, the altogether omitted (or at least misleading) Wachtell presentation to the Board on February 28, 2012, and Wachtell's failure to otherwise call CVR's attention to the perverse incentive fee terms of the Second Engagement Letters, was to cause Pici to execute the Second Engagement Letters, having fully relied on Wachtell to protect CVR from a wholly outrageous fee arrangement with the Banks.  Wachtell should have known that no company that was the target of a hostile tender would knowingly agree to such a perverse arrangement, and compounding its tortious acts was that Wachtell, CVR's trusted law firm, then directly benefitted from them by billing CVR higher fees based on the Banks' perverse fees.

36.     None of this conduct by Wachtell concerning the Form 14D-9 disclosures involved selecting from an array of reasonable choices; quite to the contrary, when confronted with the SEC's unambiguous legal requirement, there was no choice but to comply or, at minimum, to explain to CVR that the event that would trigger payment of the success fees, which in the case of a successful tender, created a conflict of interest, as later confirmed by the SEC.  And regardless, Wachtell was obligated to advise its client of the legal requirements and what it was doing.  Simply put, Wachtell's actions were at best grossly negligent, or, at worst, deliberate acts in flagrant disregard of not only a lawyer's ethical obligations, but also of the Federal securities laws and regulations.  In either case, those actions represent a failure to exercise the ordinary and reasonable skill and knowledge commonly possessed by a member of the legal profession – conduct that falls far below the standard of care required of lawyers under New York law.

37.     In fact, ████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████

38.     But for Wachtell's failure to disclose the fee terms to anyone at CVR or in the Form 14D-9, or to advise CVR what the SEC actually required that form to disclose, neither Pici nor anyone else at CVR would have misunderstood what fee terms were purportedly being agreed to in the Second Engagement Letters, let alone would anyone at CVR have agreed to such terms.

39.     CVR was under no obligation to agree to the perverse fee terms of the Second Engagement Letters.

40.     At all relevant times, CVR had the right to terminate the services of the Banks and retain other financial advisors who would agree to reasonable compensation that would not require payment of an enhanced fee if the Icahn parties succeeded in acquiring more than fifty percent of CVR's stock at the original tender price per share.

41.     Considerable other evidence adduced during discovery supports the above allegations of failing to exercise the ordinary and reasonable skill and knowledge commonly possessed by a member of the legal profession.  For example, ████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

███████████   In short, defendants had a pre-ordained a fee arrangement with the Banks, one of which (Goldman) had long-standing relationship with them, that they never bothered to accurately describe to CVR or its Board.

42.     Another example of defendants' negligence is ████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████

43.     Moreover, although ████████████████████████████████ ████████████████████████████████████████████████████ ███████████████████████████████████.

44.     Even if his understanding were somehow correct and did not alone constitute negligence, his failure to disclose it to CVR did, as his silence reflected a failure to exercise the ordinary and reasonable skill and knowledge commonly possessed by a member of the legal profession inasmuch as his understanding was contrary to any logic or common sense under the facts and circumstances.  CVR's Board – which was not even aware of the existence of the Second Engagement Letters – as well as Pici and Gross, could reasonably conclude that if the Tender Offer succeeded, the fees to be paid would be determined under the First Engagement Letters, which called for merely monthly compensation, as witnesses have stated. No wonder then that a Wachtell associate, upon

reviewing the Second Engagement Letters in April 2012, concluded the Banks were not entitled to the Success fees based on the result of the Tender Offer.

45.　　Wachtell – which touts its brand of defeating activist tender offers and knows that's why targets of such tender offers retain them – has, ██████████ ████████████████████ demonstrated it has no defense on the merits (by consistently failing to offer any evidence or expert testimony) to justify its conduct, as follows:

      a.  It was retained to advise CVR on any engagement letters entered into with the Banks, but failed to do so;

      b.  It knew CVR management and the Board had no previous experience with hostile tender offers, but failed to properly advise it;

      c.  It knew CVR was opposed to any sale or change of control, yet permitted the company to enter into perverse fee terms with the Banks that incentivized them to not help prevent such an outcome;

      d.  It never explained the fee terms of the Second Engagement Letters to CVR or how or why they were customary;

      e.  It based its legal fees on how much the Banks claimed without telling its client it was doing that;

      f.  It failed to see that the Second Engagement letters had inconsistent fee terms, though it was their obligation to ensure they were consistent;

      g.  It destroyed contemporaneous notes of a CVR Board meeting;

      h.  Defendants Roth and Brownstein never even considered that the Banks would be entitled to twice the amount of the so-called "independence fee" if the Icahn tender offer resulted in the acquisition of more than fifty percent of CVR's stock;

i.   Wachtell's justification for simply describing the Banks' fee terms as customary and not disclosing their fee arrangements is, in effect, "*so what, everyone does it, so it's ok,*" even though unequivocal SEC rules require disclosure of the material fee terms of financial advisors' fees, and worse still, it ignores the law firm's failure to inform CVR of those rules, and the risks of flouting them;

j.   Wachtell saw nothing inappropriate, or contrary to the underlying policies of the U.S. securities laws, with allowing its client to agree to allow the Banks to engage in a "Raid Defense"; and

k.   Wachtell prepared board minutes describing certain events that never occurred;

l.   ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████

m.   Wachtell knew that it based its legal fees on the amount of fees the Banks claimed, but concealed that fact from CVR and falsely stated the basis for the fees charged in their engagement letter with CVR was based on work it actually did.

46.   In short, Wachtell's duty/job was to ensure not only that CVR entered into engagement letters that were fair to the company and not perverse, but also to ensure that, regardless, the terms were publicly disclosed accurately and completely, consistent with the securities laws and SEC regulations, and that it otherwise acted honestly and fairly toward its client, but it failed to do any of that.  Its conduct reflects at best (rank) negligence – a failure to exercise the ordinary and reasonable skill and knowledge

commonly possessed by a member of the legal profession.  At worst, it reflects unethical conduct resulting in the reasonable inference that its true interest was not to advance the best interests of its client, CVR, but to accommodate its long-term client (Goldman) and friends in the investment banking world, while fattening its own wallet in the process.

47.     In late March, Mr. Pici signed the Second Engagement Letters, having received no advice whatsoever from defendants regarding their fee terms, other than being advised by Wachtell that the letters were "OK" to sign.  Moreover, although drafts of the Second Engagement Letters were vetted and revised by defendants, they neither proposed nor made any changes to the fee terms, and they failed to explain the fee terms to anyone at CVR, whom they knew had absolutely no experience retaining advisors to defend in hostile takeover battles.

48.     Throughout this time period, the CVR Board only knew (and defendants did not inform the Board otherwise) that in January 2012 Deutsche and Goldman had been retained to advise CVR on defending against any Icahn efforts to obtain control of CVR for a flat fee of no more than $4 million in total and reasonably believed that this was the total amount of fees to be paid to Deutsche and Goldman. Only after the CVR Board realized that the Icahn Tender Offer would succeed in April, a month after Mr. Pici had signed the Second Engagement Letters with Deutsche and Goldman, did the Board learn that Deutsche and Goldman, incredibly, would claim entitlement to the success fee, based on their **failure** to defeat Mr. Icahn, and claim that a successful Icahn Tender Offer, even at his original $30 per share price, constituted a "sale", based on Goldman and Deutsche's interpretation of the Second Engagement Letters.

**F.      Events following the signing of the Second Engagement Letters**

49.      By mid-April, it became clear that the Icahn Parties would obtain ownership of more than fifty percent of CVR's stock in response to their $30 per share Tender Offer. The CVR Board, aware of the inevitable success of the Tender Offer, instructed Wachtell to meet with Icahn representatives to negotiate the process of the closing of the Tender Offer.

50.      Once it became clear that an agreement ("Transaction Agreement") for closing of the Tender Offer with the Icahn Parties was about to be completed, Mr. Pici took another look at the Second Engagement Letters on April 17, 2012 and realized, for the first time, that Deutsche and Goldman might claim that they were entitled to the Enterprise Value fee. Significantly, neither Roth nor Brownstein, nor anyone else at Wachtell bothered to tell Mr. Pici or anyone else at CVR that on April 14, 2012 Wachtell lawyers had prepared a chart of fees under the Second Engagement Letters, a chart that they, including Roth and Brownstein, concealed from CVR. The defendants did not inform the Board at its April 18, 2012 meeting, where the Board approved the Transaction Agreement with Mr. Icahn, of the fees that Goldman and Deutsche would claim they were entitled to as a result of the successful Tender Offer. In fact, one of the lawyers at Wachtell, who actively participated with Roth and Brownstein in Wachtell's representation of CVR, noted in an email to another lawyer at Wachtell on April 14, 2012, while preparing the chart of fees under the Second Engagement Letters, that Goldman and Deutsche's alleged entitlement to the Enterprise Value fee upon completion of the Icahn Tender Offer at the original $30 per share price represented a "perverse incentive."

51.      Notwithstanding the fact that defendants well knew Goldman and Deutsche would claim entitlement to the Success Fees, defendants also prepared for the Board's

adoption on April 18, 2012 a boiler plate resolution that approved paying fees to Goldman and Deutsche (as well as $6 million for Wachtell) without bothering to explain to the CVR Board that the fees Goldman and Deutsche would charge were not the fees set forth in the First Engagement Letters, but the fees set forth in the Second Engagement Letters.

52.     After the conclusion of the Board call/meeting approving the signing of the Transaction Agreement on April 18, 2012, the Board remained on the call with Mr. Gross and Mr. Pici; Goldman, Deutsche, and defendants having dropped off. Mr. Pici then disclosed to the Board for the first time the existence of the Second Engagement Letters and the possibility that Goldman and Deutsche would bill CVR for the Enterprise Value fee of more than $18 million each. Shocked that Mr. Pici had entered into the Second Engagement Letters without Board approval and that the Board had not been informed of the Second Engagement Letters or these fees by defendants, the Board instructed Mr. Pici to contact Goldman and Deutsche to request that they not bill the Enterprise Value fees. Goldman and Deutsche thereafter refused to not charge the Enterprise Value fees.

53.     On or about April 23, 2012, Wachtell caused and advised CVR to file a required form 14D-9 under the federal securities laws, which, incredibly, still characterized the fee  terms entered into with Goldman Sachs and Deutsche Bank as "customary," when in fact Wachtell knew that (a) there was at least a substantial question as to whether they were customary,  and (b) customary or not, an SEC rule required disclosure of the material terms, one of which was indisputably the Success Fees provision.

54.     With respect to the 14D-9 filings, CVR relied completely on Wachtell's advice  in believing the disclosures referenced above were appropriate and  in compliance with the law.

55.     On or about May 2, 2012, defendants submitted to the Board for the first

time and in bulk draft Minutes of the Board meetings since February 2012, including what purported to be Minutes of the Board meetings of February 28 and April 18, 2012 without calling the Board's attention to (a) the false statement in the February 28 Minutes that Roth of Wachtell had made a presentation to the Board summarizing the fee terms of the Second Engagement Letters and (b) the boilerplate resolution in the April 18 Minutes purportedly authorizing CVR to pay fees to Goldman and Deutsche, which Wachtell knew would be more than $18 million each, based on Goldman and Deutsche's interpretation of the Second Engagement (an interpretation with which defendants agreed, as evidenced by the chart Wachtell lawyers had prepared on April 14, 2012).

56.     On or about May 3, 2012, in anticipation of the closing of the Tender Offer and the replacement of the CVR Board with Icahn appointed new members, Goldman and Deutsche submitted their invoices to CVR for a total of more than $36 million,  based on their calculation of the Enterprise Value of CVR. Upon receiving the invoices, the CVR Board, knowing that the new Icahn-appointed Board would be installed on May 7, 2012, decided to defer consideration of the invoices to the new Board. This deferral was confirmed with Icahn representatives, who informed Mr. Lipinski that the invoices should not be paid, pending review of all of the facts and circumstances by the new Board. That new CVR Board, after reviewing all of the facts and circumstances and consulting with newly retained outside counsel, did not approve the invoices for payment.

57.     Shortly thereafter, Mr. Lipinski, CVR's Chairman, called Brownstein and asked for an explanation of what had occurred, as described  above.  Brownstein refused to respond substantively to Mr. Lipinski, essentially giving him a *shrug of the shoulders response,* stating that Wachtell no longer represented CVR and CVR should consult other counsel.

**G.      The SEC Investigation and Cease-and-Desist Order**

58.      In 2014, the SEC initiated an investigation of CVR concerning whether the above-described form 14D-9 disclosures were appropriate and in compliance with the law.

59.      In late January 2015, after CVR produced hundreds of thousands of documents to the SEC, the SEC informed CVR that it intended to take depositions under oath of numerous present and former employees, and present and former members of CVR's Board of Directors.  The SEC took depositions, heard presentations from counsel, and ultimately proceeded with cease-and-desist proceedings against CVR as a result of Wachtell's negligent and improper advice to CVR regarding the disclosures set forth in the Form 14D-9s.

60.      In January 2017, the SEC issued a cease-and-desist order against CVR – attached as **"Exhibit 1"** hereto – finding, *inter alia*, that "CVR shareholders were unaware of potential conflicts of interest that stemmed from the Banks' fee arrangements" and that "[b]y failing to fully and accurately disclose the material terms of the Banks' compensation in its initial and 10th Amended Schedule 14D-9, CVR violated Exchange Act Section 14(d)(4) and Rule 14d-9 thereunder" and that the banks' compensation arrangements under the Second Engagement Letters, were, in fact, not "customary."

61.      More specifically, the cease-and-desist order stated (at p.2, ¶ 1, with emphasis supplied), *inter alia*, that:

> "Given the retainer agreements' expansive definition of success, ***the specific financial terms of the Banks' retention should have been disclosed*** to investors pursuant to Item 5 of CVR's Schedule 14D-9, which requires a target issuer to provide a summary of the material terms of the compensation arrangements for its advisors hired to assist with the issuer's response to a tender offer. Instead, ***CVR merely stated in its Schedule 14D-9, which was prepared by its outside legal counsel ("Outside Counsel"), that the terms of the Banks' retention were "customary."***

> ***To the contrary, it was not customary*** for the Banks to receive a success fee in this situation and, accordingly, the fee arrangements should have been described in greater detail in order to comply with SEC disclosure rules."

62.    The cease-and-desist order then proceeded to state (at p.2, ⁋ 2, with emphasis supplied) that:

> "***Due to the inadequate disclosure of the Banks' fees, CVR shareholders were unaware of potential conflicts of interest that stemmed from the Banks' fee arrangements*** as they considered the Activist Investor's tender offer. This information was material to investors because the Banks' fees increased dramatically if the company was sold, regardless of (i) whether the sale price was deemed by the board to be adequate, (ii) whether the Banks succeeded in defending against the Activist Investor's bid, or (iii) whether the Banks were successful in causing the Activist Investor to raise his bid. ***More typically, sale fees are obtained by investment banks in tender offer situations only when*** the banks' services result in the shareholders retaining their shares or obtaining appropriate value for their shares through a tender offer or other sale of the company.  Such fee arrangements customarily align the financial interests of the banks with those of the shareholders by increasing fees only when the services of the banks have fully protected the value of the shareholders' interest in the company. ***Because the fee arrangement with the Banks that ensured a so-called success fee regardless of whether shareholders obtained fair value for their shares, the interests of the Banks and CVR's shareholders diverged. The Banks' fees were not customary, and the material terms of the compensation arrangement with the Banks should have been disclosed***.

63.    This finding by the SEC that the investment banks' fees were not customary, and that it was a violation of the federal securities laws to publicly disclose them as such or otherwise disclose the actual fee  terms, was caused by defendants' failure to exercise the ordinary and reasonable skill and knowledge commonly possessed by a member of the legal profession, as described above.   And, that failure resulted in not only a burdensome SEC investigation and cease-and-desist order, but also misled CVR's management and board into entering into the perverse Second Engagement letters to

begin with (that, in turn, resulted in CVR being held obligated to pay more than $40 million in fees to the Banks, after lengthy litigation in the Supreme Court of New York, and paying excessive fees to Wachtell).

## COUNT I.  PROFESSIONAL MALPRACTICE

64.     Plaintiff realleges Paragraphs 1-63, above.

65.     On January 16, 2012, by letter to Mr. Gross Wachtell agreed to represent CVR in all matters relating to Mr. Icahn and affiliates'  stock ownership in CVR and potential future "activism" for an initial fee of $200,000 and estimated future fees of as much as $6 million.

66.     By virtue of its representation of plaintiff, defendants owed plaintiff a duty of due care, prudent advice, and representation of plaintiff in plaintiff's best interests.

67.     On information and belief, Wachtell's long-standing relationship with Goldman in jointly representing companies that were the targets of proxy contests and hostile tender offers, affected its professional competence and judgment in its representation of CVR regarding the fee terms of the Second Engagement Letters, including the preparation of the inaccurate Minutes of the February 28, 2012 CVR Board meeting, the preparation of a resolution approving fees to Goldman and Deutsche at the April 18, 2012 Board meeting, and the gross failure to inform CVR of the existence of, and SEC disclosure requirements concerning,  the Second Engagement Letters and their perverse fee terms.

68.     But, regardless of the reasons why, Wachtell's representation of CVR reflects a failure to exercise the ordinary and reasonable skill and knowledge commonly possessed by a member of the legal profession, as described above.

69.    In addition to the allegations described above, defendants were negligent and breached their duties to plaintiff and fell below the standard of care applicable to lawyers, including, but not limited to the following:

a.    Defendants knew that CVR and its management had no prior experience with respect to Proxy Contests or hostile tender offers, yet took no action to competently represent CVR in negotiating fair and appropriate fee terms with Goldman and Deutsche or explaining the terms of the Second Engagement Letters prepared by Goldman and Deutsche;

b.    Defendants never advised the CVR Board about the existence or terms of the Second Engagement Letters;

c.    Although the Second Engagement Letters were addressed to Mr. Lipinski, defendants never communicated any of their terms to Mr. Lipinski or even informed him of their existence;

d.    Defendants negligently and affirmatively misadvised and otherwise failed to explain to anyone at CVR, including Messrs. Mr. Pici and Mr. Gross and the CVR Board, the fee terms of the Second Engagement Letters;

e.    Defendants negligently and affirmatively misadvised and otherwise failed to explain to anyone at the CVR, including Mr. Pici and Mr. Gross and the CVR Board, that Goldman and Deutsche believed that the fee terms of the Second Engagement Letters would entitle them to fees based on the Enterprise Value of CVR in the event the Tender Offer resulted in the acquisition of more than fifty percent of the stock of CVR;

f.    Defendants created false minutes of the February 28, 2012 meeting of CVR's Board, as described above; any statements attributed to Wachtell in the

aforesaid Minutes were false and misleading in that they (a) falsely represented that the existing engagement letters provided for the fees described, (b) omitted to disclose that a sale of the Company included a successful acquisition of  control of CVR as a result of the Tender Offer;

g.  Defendants negligently and recklessly presented a resolution to the Board on April 18, 2012 approving fees to be paid Goldman and Deutsche, without disclosing that Goldman and Deutsche would claim entitlement to the Enterprise Value fees;

h.  Defendants otherwise failed to represent CVR's best interests with respect to the fee terms of the Second Engagement Letters, as described in detail above;

i.  Defendants "washed their hands" of any responsibility for what had occurred by informing Mr. Lipinski that CVR needed to retain separate counsel to deal with the fee claims of Goldman and Deutsche;

j.  Defendants negligently misadvised and otherwise caused CVR to file form 14D-9s, including the one on March 1, 2012, that said the Second Engagement Letters (which were entered into later that month) were "customary," an act of gross negligence that caused the company to enter into them and created the substantial risk, which materialized, that the SEC would initiate an investigation into the adequacy and sufficiency of the disclosures regarding the fee terms entered into between CVR and Goldman Sachs and Deutsche Bank, and the considerable risk that government enforcement action would be taken against CVR, which also materialized and resulted in a cease-and-desist order; and

k.      The inaccurate aforementioned Form 14D-9 was an integral part of Wachtell's negligent deception as described in this Complaint, but for which CVR never would have entered into or agreed to the fee terms of the Second Engagement Letters.

70.     Defendants' wrongful conduct proximately caused economic loss to CVR, including but not limited to (a) monetary loss occasioned by settlement in the aforesaid actions in the Supreme Court of New York, and (b) certain legal fees and costs arising out of the SEC investigation.

71.     By reason of defendants' wrongful conduct, Plaintiff is also entitled to the return of the $6 million fee it paid to Wachtell.

72.     Plaintiff requests a trial by jury on all issues so triable.

WHEREFORE, plaintiff prays for a judgment in its favor and against defendants as follows:

a.      Damages as a court and jury deem appropriate; and

b.      Costs, attorneys fees, and such other relief as the Court deems appropriate under law.

Dated:  November 12, 2018                        LAW OFFICES OF HERBERT BEIGEL

By: /s/ Herbert Beigel
Herbert Beigel
38327 S. Arroyo Way
Tucson, AZ 85739
520-825-1995
Fax: (520) 844-6215

767 Fifth Avenue, #4700
New York, New York 10153

# Exhibit 1

UNITED STATES OF AMERICA
Before the
SECURITIES AND EXCHANGE COMMISSION

SECURITIES EXCHANGE ACT OF 1934
Release No. 80039 / February 14, 2017

ADMINISTRATIVE PROCEEDING
File No. 3-17846

| | |
|---|---|
| In the Matter of<br><br>CVR Energy, Inc.<br><br>Respondent. | ORDER INSTITUTING CEASE-AND-DESIST PROCEEDINGS PURSUANT TO SECTION 21C OF THE SECURITIES EXCHANGE ACT OF 1934, MAKING FINDINGS, AND IMPOSING A CEASE-AND-DESIST ORDER |

I.

The Securities and Exchange Commission ("Commission") deems it appropriate that cease-and-desist proceedings be, and hereby are, instituted pursuant to Section 21C of the Securities Exchange Act of 1934 ("Exchange Act"), against CVR Energy Inc., ("CVR" or "Respondent").

II.

In anticipation of the institution of these proceedings, CVR has submitted an Offer of Settlement (the "Offer") which the Commission has determined to accept. Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission, or to which the Commission is a party, and without admitting or denying the findings herein, except as to the Commission's jurisdiction over it and the subject matter of these proceedings, which are admitted, Respondent consents to the entry of this Cease-and-Desist Order ("Order"), as set forth below.

III.

On the basis of this Order and Respondent's Offer, the Commission finds that[1]:

### Summary

1.    This matter concerns CVR Energy, Inc.'s ("CVR's") failure to adequately disclose the material terms of its fee arrangements with two investment banks (the "Banks") in connection

---

[1] The findings herein are made pursuant to Respondent's Offer of Settlement and are not binding on any other person or entity in this or any other proceeding.

with financial advisory services they provided to CVR during a hostile tender offer by a well-known shareholder activist (the "Activist Investor"). Pursuant to the Banks' fee arrangements, the Banks collectively claimed approximately $36 million in "sale fees," also known as "success fees," even though the Activist Investor was able secure control of the company in the face of CVR's resistance, at a price that the CVR board of directors believed undervalued the company, and without raising its bid by any amount. Nor did the Banks obtain a competing bid from a "white knight" or third-party offeror before obtaining the success fees. Given the retainer agreements' expansive definition of success, the specific financial terms of the Banks' retention should have been disclosed to investors pursuant to Item 5 of CVR's Schedule 14D-9, which requires a target issuer to provide a summary of the material terms of the compensation arrangements for its advisors hired to assist with the issuer's response to a tender offer. Instead, CVR merely stated in its Schedule 14D-9, which was prepared by its outside legal counsel ("Outside Counsel"), that the terms of the Banks' retention were "customary." To the contrary, it was not customary for the Banks to receive a success fee in this situation and, accordingly, the fee arrangements should have been described in greater detail in order to comply with SEC disclosure rules.

2.    Due to the inadequate disclosure of the Banks' fees, CVR shareholders were unaware of potential conflicts of interest that stemmed from the Banks' fee arrangements as they considered the Activist Investor's tender offer. This information was material to investors because the Banks' fees increased dramatically if the company was sold, regardless of (i) whether the sale price was deemed by the board to be adequate, (ii) whether the Banks succeeded in defending against the Activist Investor's bid, or (iii) whether the Banks were successful in causing the Activist Investor to raise his bid. More typically, sale fees are obtained by investment banks in tender offer situations only when the banks' services result in the shareholders retaining their shares or obtaining appropriate value for their shares through a tender offer or other sale of the company. Such fee arrangements customarily align the financial interests of the banks with those of the shareholders by increasing fees only when the services of the banks have fully protected the value of the shareholders' interest in the company. Because the fee arrangement with the Banks that ensured a so-called success fee regardless of whether shareholders obtained fair value for their shares, the interests of the Banks and CVR's shareholders diverged. The Banks' fees were not customary, and the material terms of the compensation arrangement with the Banks should have been disclosed.

3.    By failing to fully and accurately disclose the material terms of the Banks' compensation in its initial and 10th Amended Schedule 14D-9, CVR violated Exchange Act Section 14(d)(4) and Rule 14d-9 thereunder.

## **Respondent**

4.    CVR is a Delaware corporation based in Sugar Land, Texas. At the time of the facts underlying this Order, it was an independent refiner and marketer of transportation fuels, and through its holdings in CVR Partners, LP, engaged in the nitrogen fertilizer business. Its equity securities are registered under Section 12(b) of the Exchange Act and are currently traded on the New York Stock Exchange.

2

## Facts

5.      On January 13, 2012, the Activist Investor filed a Schedule 13D disclosing a beneficial ownership interest in CVR amounting to approximately 14.54%. On the same day, CVR adopted a shareholder rights plan, or "poison pill," and prepared to defend itself from the Activist Investor's bid for corporate control.[2]  On the same day, CVR issued a press release stating that the rights plan was designed to "protect against inadequate or coercive takeover attempts, or other tactics that might be used to gain control of the company without negotiating with the Board of Directors or paying all stockholders a fair price for their shares." CVR also retained Outside Counsel and later, the Banks, as its financial advisers.

6.      CVR and the Banks memorialized the terms of their relationships in an initial set of engagement letters signed in January and February 2012. Significantly, the first set of engagement letters excluded work related to a tender offer, but stipulated that CVR would offer the Banks the opportunity to work for "customary" fees and other provisions in the event a tender offer occurred. Outside Counsel assisted CVR in negotiating and worked with the Banks in drafting the engagement letters.

7.      On February 23, 2012, the Activist Investor announced a tender offer for CVR.

8.      On March 1, 2012, CVR filed its initial Schedule 14D-9, prepared by Outside Counsel, advising shareholders not to tender their shares into the unsolicited tender offer. Notwithstanding the fact that CVR had yet to work out with the Banks the scope of services or payment terms with respect to the tender offer, the filing incorrectly stated that "[t]he Company has *retained* [Bank 1] and [Bank 2] as its financial advisors in connection with, among other things, the Company's analysis and consideration of, and response to the, [Activist Investor's tender] Offer. The Company *has agreed to pay customary compensation for such services*." (Emphasis added).

9.      On March 21 and 23, 2012, CVR and the Banks, respectively, signed a second set of engagement letters, which were negotiated by the Banks and Outside Counsel, including advisory services by the Banks related to a tender offer. CVR's CEO did not review the engagement letters, but both CVR's Chief Financial Officer (to whom the engagement letters were addressed) and General Counsel understood, from discussions with Outside Counsel, that the Banks' services were part of a suite of legal and financial advisory services to CVR that involved a coordinated "raid defense" package that were designed to help CVR maintain its independence from the Activist Investor's hostile tender offer. In fact, documents associated with the financial advisory services used the term "raid defense engagement."

10.     The second set of letters, which were signed by CVR's CFO, provided for possible fees to each bank, including a $9 million fee in the event CVR remained independent, a $4 million

---

[2]  A shareholder rights plan, colloquially known as a "poison pill," is a defensive measure used by a corporation's board of directors against an unsolicited, non-negotiated takeover. Such a plan ordinarily gives shareholders the right to buy more shares at a discount if one shareholder buys a certain percentage or more of the company's shares at which point every shareholder (except the one who triggered activation of the plan) will have the right to buy a new issue of shares at a discount. If every other shareholder is able to buy more shares at a discount, such purchases would dilute the prospective bidder's interest, and the cost of the bid would rise substantially.

"discretionary fee" similar to a bonus payments that would be purely at the discretion of the board, a fee for the announcement of a transaction ($6 million), and a sales fee payable in the event of a sales transaction (.525% of the aggregate consideration).

11.     Sales fees—sometimes referred to as "success fees"—are paid to investment banks for financial advisory services in connection with tender offers and have generally been accepted by clients because such fees align the interests of the banks with those of the shareholders. When banks assist in bringing a value-creating transaction to shareholders (such as, for example, causing a bidder to raise its offer price), success fees generally reward the banks for their role in bringing the transaction to fruition (*i.e.*, the higher the price in the value-enhancing deal, the larger the reward for the banks).

12.     However, the Banks believed they would be entitled to receive a payout even under a scenario where the Activist Investor's tender offer bid prevailed at the original offer price and the Banks were unable to create a value-enhancing deal for CVR shareholders. Unlike a typical sales fee arrangement, the sales fee provision with the Banks could have been triggered, and, in fact, was triggered, regardless of whether the deal was in the best economic interests of shareholders (*i.e.,* company is "sold" at a discount to a valuation metric otherwise determined to be realistic).

13.     In the weeks following its initial Schedule 14D-9, CVR filed nine amendments but, none of the filings disclosed the material terms of the Banks' fees, including provisions that could potentially motivate the Banks in ways that may not be aligned with the interests of CVR's investors (such as the payment of sale transaction fee even in the event of a sale to the Activist Investor or the lack of efforts by the Banks to solicit potential competing bids from other third parties). In each of these filings, CVR's board recommended that shareholders not tender their shares because the Activist Investor's offer, among other things, undervalued CVR.

14.     On April 3, 2012, the Activist Investor announced that he had prevailed and that over 50% of CVR shareholders had indicated their desire to tender their shares. Shortly after, CVR and the Activist Investor began to negotiate the terms by which the Activist Investor could complete the tender offer. The poison pill, which provided CVR with a first line of defense, prompted the Activist Investor to negotiate with the board with a view towards having the rights plan rescinded or lifted so that he could purchase shares that had been tendered without activating the rights available under the poison pill.

15.     During this time, Outside Counsel separately began to calculate its own legal fees as well as fees owed to the Banks. Through this exercise, Outside Counsel concluded that the Banks would be owed a "success fee" even though the Activist Investor had prevailed. On April 14, 2012, lawyers of Outside Counsel prepared a fee chart for their internal use and determined that in the event of a successful tender offer, each Bank would receive a sales transaction fee in the amount of $18 million. An email message between lawyers of Outside Counsel expressed surprise that "there's nothing carving out a hostile deal with [the Activist Investor] from the definition of a sale" and that this created a "weird perverse incentive for [Bank 1] and [Bank 2]."

16.     For the two weeks following the Activist Investor's announcement, the parties negotiated the terms by which the Activist Investor could complete the tender offer. During the

4

negotiations for what ultimately became the "Transaction Agreement," counsel for the Activist
Investor specifically asked a senior partner of Outside Counsel for the amount of fees CVR would
be obligated to pay to the Banks. The senior partner, however, did not disclose to the Activist
Investor's counsel the details surrounding the fee arrangements, which he considered to be a
leverage point in the negotiations. The senior partner, in recognizing the materiality of the fee
arrangements, believed at the time, that had the fees been disclosed, the Activist Investor could
have reduced the per share price of his offer in accounting for an impending liability to the Banks.

17.     On April 19, the parties reached a negotiated Transaction Agreement whereby CVR
agreed to remove the poison pill, an obstacle that made the tender offer practically impossible, in
exchange for the Activist Investor agreeing to certain protections for minority shareholders.

18.     On the same day, CVR issued a press release on its Form 8-K announcing a
Transaction Agreement which provided CVR shareholders with "important protections," namely
the "[r]educed conditionality to the offer" while increasing the "[p]otential upside from a future
sale." The Transaction Agreement was included as an attachment to CVR's 10th Amended
Schedule 14D-9 filed on April 23, 2012. In the press release, CVR reiterated that it continued to
believe the Activist Investor's tender offer price undervalued CVR by as much as $12 a share, but
recognized "many of the Company's stockholders may prefer to realize value in the near term and
would consider the offer, as revised, an attractive near-term alternative." Moreover, in connection
with the Transaction Agreement, CVR's board was not required to vote on whether to sell the
company to the Activist Investor. To the contrary, as disclosed in its press release that CVR
reserved the right under the Transaction Agreement to sell the company to a party other than the
Activist Investor.

19.     The negotiated Transaction Agreement between CVR and the Activist Investor was
unique and unprecedented in that it had an offer on the table that the board believed was
"woefully" inadequate and not in the best interest of shareholders to accept, but represented a
compromise between the board and the Activist Investor given that the majority of CVR's
shareholders had supported the tender offer.

20.     On April 23, 2012, CVR filed Amendment No. 10 to its Schedule 14D-9, which
was prepared by Outside Counsel. In the filing, the board continued to reject the tender offer while
reiterating their initial recommendation that shareholders not tender their shares because the
Activist Investor's bid undervalued the company. CVR's original Item 5 disclosure, however,
continued to remain in effect and misleadingly described the Banks' fees as "customary."

21.     The Schedule 14D-9 also failed to disclose any material terms of the Banks'
compensation, including the sales fee provision. As a result, shareholders, who were deciding
whether or not to tender, were unaware that the Banks would receive a sale fee payout regardless
of whether the deal reached with the Activist Investor was ultimately in the best interests of
shareholders or whether the Banks' interests were aligned with those of the shareholders.
Notwithstanding the board's adverse recommendation and in the absence of the disclosure of the
material terms of the fee agreements with the Banks, a majority of security holders tendered their
shares.

5

## Violations

22.     Exchange Act Section 14(d)(4) requires any recommendation by a target to accept or reject a tender offer to be made in accordance with the rules prescribed by the Commission. Rule 14d-9(b) requires an issuer making a solicitation or recommendation in response to a tender offer to file a Schedule 14D-9. The disclosure in Schedule 14D-9 is intended to "assist security holders in making their investment decision and in evaluating the merits of a solicitation/recommendation." Exchange Act Release No. 16384 (Nov. 29, 1979). Rule 14d-9(d) specifies the information to be included in a Schedule 14D-9. The required disclosures include "a summary of all material terms of employment, retainer or other arrangement for compensation" for all persons who have been retained for the direct or indirect purpose of assisting the issuer in making a solicitation or recommendation in response to a tender offer. This disclosure is specifically required under Item 5 of Schedule 14D-9 and corresponding Item 1009(a) of Regulation M-A, both titled "Persons/assets, retained, employed, compensated or used."

23.     As a result of the conduct described above, CVR violated Section 14(d)(4) and Rule 14d-9 thereunder which require an issuer making a solicitation or recommendation in response to a tender offer to file a Schedule 14D-9 which, among other things, must include "a summary of all material terms of employment, retainer or other arrangement for compensation" for all persons who have been retained for the direct or indirect purpose of assisting the issuer in making a solicitation or recommendation in response to a tender offer.

## CVR's Cooperation

24.     In determining to accept the Offer, the Commission considered remedial acts promptly undertaken by Respondent and its extensive cooperation afforded the Commission staff.

## Findings

25.     Based on the foregoing, the Commission finds that Respondent, CVR, violated Exchange Act Section 14(d)(4) and Rule 14d-9 thereunder.

## IV.

In view of the foregoing, the Commission deems it appropriate to impose the sanctions agreed to in Respondent CVR's Offer.

Accordingly, it is hereby ORDERED that:

A.     Pursuant to Section 21C of the Exchange Act, Respondent CVR cease and desist from committing or causing any violations and any future violations of Section 14(d) of the Exchange Act and Rule 14d-9 thereunder.

6

B.        Respondent acknowledges that the Commission is not imposing a civil penalty based upon its cooperation in a Commission investigation. If at any time following the entry of the Order, the Division of Enforcement ("Division") obtains information indicating that Respondent knowingly provided materially false or misleading information or materials to the Commission, or in a related proceeding, the Division may, at its sole discretion and with prior notice to the Respondent, petition the Commission to reopen this matter and seek an order directing that the Respondent pay a civil money penalty. Respondent may contest by way of defense in any resulting administrative proceeding whether it knowingly provided materially false or misleading information, but may not: (1) contest the findings in the Order; or (2) assert any defense to liability or remedy, including, but not limited to, any statute of limitations defense.

By the Commission.

Brent J. Fields
Secretary

7